UNITED STATES of America,
Plaintiff-Appellee,

v.

Michael ROBERTS, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles WILLIAMS, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Stanley YELARDY, Defendant-Appellant.

Nos. 76–1670, 76–2092 and 76–1669.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 9, 1976.

Decided Feb. 2, 1977.

Rehearing and Rehearing En Banc
Denied March 28, 1977.

Arthur James Rubiner, Southfield, Mich. (Court-appointed CJA), for defendant-appellant in No. 76–1669.

H. David Soet, Pinsky & Soet, Grand Rapids, Mich. (Court-appointed CJA), for defendant-appellant in No. 76–1670.

Thomas J. Plachta, Grand Rapids, Mich. (Court-appointed CJA), for defendant-appellant in No. 76–2092.

Frank Spies, U.S. Atty., Robert C. Greene, Grand Rapids, Mich., for plaintiff-appellee.

Before McCREE, LIVELY and ENGEL, Circuit Judges.

LIVELY, Circuit Judge.

The appellants were jointly indicted, tried and convicted of armed robbery of the University Branch of the Michigan National Bank in East Lansing. The bank was robbed by three masked bandits at about 3:15 p.m. on August 27, 1973. Neither Roberts nor Williams questions the sufficiency of the evidence, and we have concluded that Yelardy's contention that there was not sufficient evidence of his guilt is without merit. The evidence will be detailed only as necessary to deal with the issues to be discussed.

## I.

■ All defendants made motions to limit the scope of the evidence by excluding all references to the fact that they were inmates of the Milan Federal Correctional Institute at the time of the bank robbery. The appellants were taking part in a "work release" program under which they were transported daily from Milan to Ann Arbor to attend classes at the University of Michigan. The driver of the bus which took them back and forth to Ann Arbor and several security guards at Milan were government witnesses. The motion to limit testimony required the district court to weigh the probative value of the evidence offered against the possible prejudice of revealing the fact that the appellants had been previously convicted of some crime. Rule 403, Fed.R.Ev. The jury is entitled to know the "setting" of a case. It cannot be expected to make its decision in a void— without knowledge of the time, place and circumstances of the acts which form the basis of the charge. There was no direct evidence of other misdeeds by the defendants, and the fact of their incarceration at the time of the robbery was not unduly emphasized by the government. The district court cautioned the jury that it should infer nothing about the bank robbery charge from the fact that the defendants were inmates. There was no abuse of discretion in the denial of the motions.

## II.

The appellants contend that the indictment should have been dismissed because of the delay in indicting them and bringing them to trial. All appellants were arrested the day after the robbery, August 28, 1973, and formally charged on September 7, 1973. However, these charges were dropped on motion of the government on October 9, 1973. Thereafter all three men were transferred from Milan and all were eventually paroled. All were again taken into custody on bank robbery charges following the return of the indictment in May 1975.

■ Since appellants were arrested on August 28, 1973 their right to a speedy trial under the Sixth Amendment accrued at that time rather than on the date of their indictment. *Dillingham v. United States,* 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975). The trial commenced approximately 26 months after the first arrest and this delay was sufficient to require further inquiry. The district court held a pre-trial hearing on the motions to dismiss and all appellants testified. The court denied the motions, but reserved final decision of the question until the evidence in the trial had been heard. At the conclusion of the trial, he again denied motions to dismiss for delay in bringing the case to trial, finding that the appellants had not demonstrated actual prejudice by reason of delay and noting that the case was "a complex one with a large amount of circumstantial evidence which had to be scientifically tested and analyzed, certain witnesses who changed their stories, and confidential informants whose identity was to be kept secret requiring a prosecution judgment as to the feasibility of their use."

The record supports the finding of the district court that prejudice by reason of delay was not established. In addition to the considerations noted by the trial judge in his final order, at least two of the appellants were involved in other court proceedings during the pre-indictment period and this may have contributed to delay in bringing the charges in the present case. Applying the "balancing test" mandated by the

Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), we conclude that the district court did not err in holding that the appellants were not deprived of their Sixth Amendment right to a speedy trial. *United States v. Mulligan*, 520 F.2d 1327 (6th Cir. 1975).

■ The appellants also argue that they were deprived of due process of law by reason of the government's delay in seeking indictments after its investigation of the robbery was complete. The Due Process Clause of the Fifth Amendment requires dismissal of a charge if the government intentionally delays criminal proceedings to gain a tactical advantage and the defendant suffers substantial prejudice by reason of such pre-indictment delay. *United States v. Marion* 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *United States v. Swainson*, 548 F.2d 657 (6th Cir. 1977); *United States v. Alred*, 513 F.2d 330 (6th Cir.), *cert. denied*, 423 U.S. 828, 96 S.Ct. 47, 46 L.Ed.2d 45 (1975). The general allegations of the appellants fall short of establishing either of the requirements for invoking the Fifth Amendment. There was no showing that the delay was intentional and devised to gain a tactical advantage. As noted in discussion of the Sixth Amendment claim, the allegations of prejudice were not sustained. There was no indication that proposed alibi witnesses would have been more helpful if the trial had been held sooner. The inconclusive testimony of those who did testify appears to have resulted more from a lack of any identifiable relationship with the defendants than from a dimming memory.

### III.

■ The appellants made motions to quash search warrants and suppress evidence seized in the search of three residences. One of the FBI agents who obtained the warrants conceded that the affidavit for each warrant contained some erroneous statements. This court recently dealt with the problem of inaccuracies in affidavits for search warrants in *United States v. Luna*, 525 F.2d 4 (6th Cir. 1975), *cert. denied*, 424 U.S. 965, 96 S.Ct. 1459, 47 L.Ed.2d 732 (1976), and concluded as follows:

There are two circumstances which we believe authorize the impeachment of an affidavit which on its face is sufficient probable cause for issuance of the warrant. The first of these consists of knowing use of a false statement by the affiant with intent to deceive the court. This is true even if the statement can be said to be immaterial to the issue of probable cause. In our judgment such perjury must lead to suppression of the evidence in order to prevent fraud upon the judicial process.

The second circumstance arises when a law enforcement agent recklessly asserts a statement essential to establishment of probable cause and the charge is subsequently made that the statement is both false and recklessly made.

\* \* \* \* \* \*

On the other hand, we do not believe that good faith error in a carefully prepared search warrant affidavit should be held to require suppression of evidence even where the erroneous allegation was essential to establishment of probable cause. *Id.* at 8–9.

In the present case the district court conducted a hearing on the motions to quash and suppress. The appellants did not claim that the errors in the affidavits were intentional. They contended that the false statements were made recklessly, but failed to establish that " . . . when made the affiant did not have reasonable grounds for believing [them]." *Id.* at 8. The district court found that the misstatements were not material to the issue of probable cause and resulted from good faith error, noting the pressures of time involved. There was no error in denial of these motions.

### IV.

■ All appellants argue that there was prejudicial error in the failure of the district court to declare a mistrial. It is charged that the prosecutor commented in his closing argument on the failure of the

defendants to testify and made false statements and misleading arguments. We have examined the closing arguments of all defense counsel and of the prosecuting attorney. Two of the defense attorneys argued that they had advised their clients not to testify because two and one-half years had elapsed between the robbery and trial, and little or no corroboration could be developed for their versions of how they spent the day of August 27, 1973. Addressing the jury, one defense attorney said, "Indeed, you might ask yourselves, what were you doing at 3:15 on August 27, 1973?" The Assistant United States Attorney, speaking in rebuttal, said to the jury, " . . . my question to you, or the Government's question to you is, do you think you would remember when you were arrested for bank robbery?"

Since defense counsel had reminded the jury that their clients had not testified and had attempted to explain why this had occurred, the prosecutor was entitled to answer their arguments. Two appellants who were not represented by the defense attorney who made the argument quoted above, contend that they did not "bait" the prosecuting attorney and were prejudiced by his reply to their co-defendant's argument. No one objected to the prosecutor's remarks when they were made. If they could reasonably have been construed as a comment on the failure of all defendants to testify, this should have been obvious to defense counsel and an immediate objection should have been made. The objections came after the verdict was in. Considering all the arguments, the prosecutor's statements could be construed as referring to the ability of the defendants to assist their counsel by supplying information as to their activities and contacts on August 27, 1973.

■ The other contention that a mistrial should have been declared relates to the introduction of approximately $5,500 in currency which was seized from one of the three apartments searched by the FBI. It was the position of the government that this money was part of the proceeds of the August 27, 1973 robbery. In a post-trial affidavit an FBI agent stated that money taken from the bank had been secreted in Niles, Michigan and later taken to New York. The defendants then filed motions for a mistrial, claiming that the prosecution knew that the $5,500 exhibited to the jury was not loot from the robbery. This argument is specious. The affidavit of the FBI agent did not state that all the stolen money had been removed to New York. Over $83,000 was taken in the robbery and only $5,500 was sized pursuant to authorized searches and received in evidence. There was no inconsistency in the two positions taken by the government.

A motion for a mistrial is addressed to the sound discretion of the trial judge. His decision on such a motion may be reversed only upon a showing that he has abused this discretion. The record in the present case reveals no such abuse.

V.

■ Appellant Williams contends that the indictment in the present case should have been dismissed as to him for failure of the government to follow the procedures prescribed in the Interstate Agreement on Detainers. The United States became a party to this Agreement in 1970 with the adoption of Pub.L. No. 91–538, §§ 1–8, 84 Stat. 1397–1403, 18 U.S.C.A. App. 207–213 (1976 Supp.). A concise discussion of the purposes of the Agreement and the procedures which it prescribes is contained in the opinion of Judge Van Dusen in *United States ex rel. Esola v. Groomes*, 520 F.2d 830, 833–34 (3rd Cir. 1975). Briefly, the Agreement has two purposes: (1) to minimize interference with the participation in programs of prisoner treatment and rehabilitation of persons serving sentences in one jurisdiction who have untried charges pending against them in another jurisdiction and (2) to expedite trial of such pending charges.

Williams asserts that he was being held at the Queens House of Detention at Kew Gardens, New York on a pending New York state charge when the federal arrest warrant was issued in the present case. He contends that he was returned to the West-

ern District of Michigan from New York pursuant to a writ of habeas corpus ad prosequendum on August 8, 1975. He further claims that, after arraignment before a federal magistrate at Grand Rapids, Michigan, he was returned to the detention center in New York without being tried on the federal charge. He was again transferred from the Queens House of Detention to the Western District of Michigan in October 1975 at which time he was tried and convicted.

Article IV(e) of the Interstate Agreement on Detainers provides—

(e) If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

As the court pointed out in *Groomes, supra*, 520 F.2d at 836–37, the purpose of Article IV(e) is "to minimize that adverse impact of a foreign prosecution on rehabilitative programs of the confining jurisdiction."

Though the government has not disputed Williams' statement of the sequence of events, the record appears to indicate that Williams was actually delivered into the custody of a marshal for the Western District of Michigan at Pontiac, in the Eastern District of Michigan on August 4, 1975. Since the record is not absolutely clear, and since Williams was undoubtedly returned to New York after his arraignment at Grand Rapids, we will assume that he was in fact originally transferred from New York pursuant to a request from an appropriate officer of the Western District of Michigan. We also conclude that where the Interstate Agreement is applicable the issuance. of a writ of habeas corpus ad prosequendum by a jurisdiction in which there is a pending charge satisfies both requirements of Article IV(a), that a detainer be lodged and a written request for temporary custody be made. Article IV(a) provides—

(a) The appropriate officer of the jurisdiction in which an untried indictment, information, or complaint is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party State made available in accordance with article V(a) hereof upon presentation of a written request for temporary custody or availability to the appropriate authorities of the State in which the prisoner is incarcerated: *Provided,* That the court having jurisdiction of such indictment, information, or complaint shall have duly approved, recorded, and transmitted the request: *And provided further,* That there shall be a period of thirty days after receipt by the appropriate authorities before the request be honored, within which period the Governor of the sending State may disapprove the request for temporary custody or availability, either upon his own motion or upon motion of the prisoner.

However, these determinations do not dispose of the issue raised by Williams.

It is clear from the record that in August 1975 and in October of that year Williams was being held at the Queens detention center because he was unable to make bail in a pending New York charge. He had not been tried or sentenced by a New York court and was not "serving a term of imprisonment" in New York. Article IV(a), *supra*. Williams argues that upon subsequent conviction in the New York proceedings he would be entitled to credit for time served in the detention facility, and thus he was serving a term of imprisonment when he was transferred to Michigan. Such an interpretation would not further the purposes of the Agreement. Williams was in a holding facility on a temporary commitment. Though he was engaged in a program of rehabilitation at the center, he would necessarily be required to drop that program upon his eventual transfer to a permanent facility. We conclude that the Agreement is only concerned that a sentenced prisoner who has entered into the life of the institution to which he has been committed for a term of imprisonment not

have programs of treatment and rehabilitation obstructed by numerous absences in connection with successive proceedings related to pending charges in another jurisdiction. There is no indication in the language of the Agreement or in the legislative history that its provisions were intended to apply to persons being detained for trial who are not serving prison sentences.

Our conclusion that the Agreement does not apply to persons in custody awaiting final disposition of charges in the custodial jurisdiction is bolstered by examination of Article III thereof. This article provides that a prisoner against whom an untried charge is pending in another jurisdiction "during the continuance of the term of imprisonment," may require the charging jurisdiction to bring him to trial within 180 days after he makes a request for disposition of the pending charges. Under Williams' interpretation of the Agreement a person being held for trial could wait until his trial was set in the jurisdiction where he was detained and then make a request which would require that he be transferred to another jurisdiction for trial, possibly disrupting the trial schedule of the first jurisdiction.

It should also be noted that the Uniform Criminal Extradition Act, which was adopted by many jurisdictions prior to promulgation of the Interstate Agreement on Detainers, contains express provisions for transfer for the purpose of criminal proceedings in another state of persons imprisoned while awaiting trial. *See* Uniform Criminal Extradition Act §§ 5 and 18.

We conclude that the Interstate Agreement on Detainers does not apply to a person who is imprisoned awaiting disposition of pending charges and who has not been sentenced to a term of imprisonment. *See People v. Butcher*, 46 Mich.App. 40, 45, 207 N.W.2d 430 (1973).

We have considered the other claims of error made in briefs and oral argument and have concluded that they do not merit discussion.

The judgments of the district court are affirmed.