UNITED STATES of America,
Plaintiff-Appellee,

v.

Ted DUDEK a/k/a Ted Landers,
Defendant-Appellant.

No. 76–2537.

United States Court of Appeals,
Sixth Circuit.

Argued April 20, 1977.

Decided Aug. 16, 1977.

Elmer A. Giuliani, Paul Mancino, Jr., Cleveland, Ohio, for defendant-appellant.

Fredrick M. Coleman, U. S. Atty., Cleveland, Ohio, Michael W. Farrell, Washington, D. C., for plaintiff-appellee.

Before EDWARDS, PECK and ENGEL, Circuit Judges.

EDWARDS, Circuit Judge.

This is the second appeal in the federal prosecution of appellant on charges of conspiracy to commit and commission of certain federal firearms offenses. In the first appeal by the United States, this court reversed the suppression of evidence which had been ordered by the District Judge. We there held that the admitted failures of police who had executed the searches to timely file inventories and returns as required by Ohio law did not require suppression of the evidence. *United States v. Dudek,* 530 F.2d 684 (6th Cir. 1976).

Appellant had originally been charged, along with codefendants Anthony Bruno and Joseph Seidita, in a 16-count indictment. On remand by this court, appellant alone was tried before a jury on four counts of the original indictment in which he was named. Count I charged appellant and his codefendants with conspiracy to commit specified federal firearms offenses, in violation of 18 U.S.C. § 371 (1970). In Count II appellant, along with codefendants Bruno and Seidita, was charged with engaging in the business of dealing in firearms and ammunition without being licensed, in violation of 18 U.S.C. §§ 922(a)(1) and (2)(1970). Counts III and V charged appellant with knowingly receiving and possessing firearms, having been a convicted felon, in violation of 18 U.S.C. App. § 1202(a)(1) (1970). Count III pertained to events on or about October 25, 1973, and Count V to events on or about November 3, 1973. After trial appellant was convicted on all counts, except Count V.

The essence of the indictment as it related to appellant was that together with co-defendants Bruno and Seidita he conspired to and did engage in the business of dealing in firearms in interstate commerce without a license, and did receive and possess firearms, being previously convicted of a felony. The firearms and ammunition in question were stolen in three burglaries committed by three other codefendants, Mylar, Marinelli and McGraw. Seidita, Mylar, Marinelli and McGraw all testified at the trial under grants of immunity concerning the burglaries or the disposition of the guns, ammunition and other goods stolen in the three burglaries.

Two burglaries took place on the night of October 24, 1973. In one, approximately 30 guns were stolen from the home of Robert Cartwright in New Castle, Pennsylvania, and brought back to the house in Youngstown, Ohio, where Mylar lived. In the other, the McFarland Hardware Store in New Wilmington, Pennsylvania, was burglarized of merchandise, including ammunition, which was then stored in Marinelli's garage in Youngstown, Ohio.

Mylar testified that before these two burglaries he had asked codefendant Bruno if he was interested in buying some guns, and that Bruno told Mylar "to let him know when we got them." The next day after the burglary appellant, in company with Bruno and Seidita, went to Marinelli's garage and inspected the merchandise and ammunition therein and then went to Mylar's house and inspected the approximately 30 guns in his attic. Mylar testified as to that same day:

> So I said, "Well, what would you give us for the hardware and the guns together?"
>
> And they come up with a price, I believe it was around—
>
> THE COURT: Who? Who said what?
>
> THE WITNESS: Oh.
>
> A. At this time, I believe it was mostly Mr. Bruno talking—speaking.
>
> Q. Was Mr. Dudek there?
>
> A. Yes, sir.
>
> Q. Did he have any discussion with you about this at all?

> A. Just general talking about the guns, in general.
>
> Q. Did he have any discussions with Mr. Bruno?
>
> A. They were discussing money.
>
> Q. What happened then?
>
> A. Well, they made me an offer—
>
> MR. GIULIANI: Objection.
>
> THE COURT: The objection shall be sustained.
>
> Who made the offer?
>
> THE WITNESS: I believe Mr. Bruno quoted the price that they were willing to pay for both loads.
>
> MR. GIULIANI: Objection, your Honor.
>
> THE COURT: The objection shall be overruled. That answer shall remain.
>
> Q. Do you have a recollection of the price?
>
> A. 3,000, 2,500 or 3,000, something like that.
>
> Q. That would be the price for what?
>
> A. For the guns that I had placed in the attic, and for the hardware at Marinelli's garage.
>
> Q. At the time you negotiated and agreed on the price, who was in the attic?
>
> A. Myself, Joe Seidita, Dudek and Bruno.
>
> Q. Now, what happened then?
>
> A. The four of us, myself, Seidita, Bruno and Dudek carried all the firearms from the attic downstairs and placed them in an automobile.

The burglary trio of Mylar, McGraw and Marinelli stole approximately 60 firearms from the Weaver Sporting Goods Store in Greenville, Pennsylvania, about a week later. These were also taken to Mylar's house and again appellant and Bruno came to inspect them. Mylar testified:

> Q. What did you do next in relation to those guns?
>
> A. I called Anthony Bruno.
>
> Q. Did you have a conversation with him relating to those guns?
>
> A. Yes, sir.

Q. As a result of that conversation, what did you do, if anything?

A. Well, I met them at the garage to show them the guns.

Q. Whom did you meet?

A. Bruno and Dudek.

Q. Who else was there?

A. At this time, possibly Seidita, but I'm not 100 percent sure; I just don't recall.

Q. Was McGraw there?

A. No. I believe it was just myself, Dudek and Bruno.

Q. Did you have a discussion about the guns and the ammunition?

A. Yes, sir.

Q. The scopes and the binoculars?

A. Yes, sir.

Q. What was the substance of the conversation?

A. Just that would they be interested in buying them, and, you know, how much would they offer for them.

Q. Was an examination made of the guns?

A. Yes, sir.

Q. Who made them?

A. Dudek and Bruno.

Q. Did they have any discussion with each other about the guns?

A. Yes, sir. I had gave them an inventory list that I had made, and they were looking that over.

Q. Did you give them a list of the whole thing, the whole kit and caboodle?

A. Yes, everything that was there in the garage.

Q. Did you conduct any negotiation with them concerning those weapons or that load of material?

A. Yes, sir. They offered me a price, and I told them that I would accept it.

Q. Did you sell the guns?

A. Yes, sir.

Q. To whom did you sell them?

A. To Bruno and Dudek.

Q. When?

A. Well, it would be the following—I believe it was the following afternoon after the burglary, the day after the burglary.

* * * * * *

Q. After you came to your arrangement with Mr.—by the way, do you recall how much was involved, how much money was involved in the sale of that garage of firearms and scopes and other items?

A. Sir, I would have to say around $3,000.

Aside from one Raven .25 automatic gun which Ohio police found in Danny Mylar's possession, none of the guns was found in the possession of the codefendants. In fact, except for one other weapon, the stolen guns were never recovered by police.

No guns or ammunition were found on the premises of the two places searched under state search warrants. What was found was part of the merchandise stolen from the McFarland Hardware Store on October 24, 1973, at the same time that some ammunition was stolen.

Several witnesses also testified over vigorous objection by defense counsel to a number of other occasions some months before and after the three burglaries referred to above, when Mylar and Marinelli had shown stolen merchandise to appellant and Bruno, and appellant had quoted prices after consulting catalogues.

It is undisputed that neither appellant nor Bruno nor Seidita was licensed to deal in firearms. It is also undisputed that appellant had a felony conviction in the state of Ohio.

## APPELLATE ISSUES

Appellant claims that the convictions must be set aside because they are contrary to the evidence. He also presents one issue of constitutional magnitude claiming Fourth Amendment abuse in failure of the affidavits for the search warrants to comply with the standards of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Additionally, he offers 12 issues claiming reversible errors at trial.

## SUFFICIENCY OF PROOFS

 The prosecution's evidence of appellant's guilt in relation to the conspiracy and the substantive crime counts of the indictment was clear and specific. Much of it was undisputed. Appellant's counsel argues here, as he did before the jury, that denials or absence of knowledge of appellant's complicity testified to by persons close to the crimes concerned should lead to an opposite conclusion to that which the jury reached. But, of course, that inference was for the jury. And, of course on appeal we view the facts from the point of view favorable to the government which was accepted by the jury in its verdict of guilty. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Craven,* 478 F.2d 1329, 1333 (6th Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 54, 38 L.Ed.2d 85 (1973). On the facts and law stated above, we hold that there was ample proof for the jury to find guilt beyond reasonable doubt.

## THE FOURTH AMENDMENT ISSUE

 Appellant asserts that the two affidavits printed as Appendices A and B to this opinion did not serve to meet the two tests set forth in the *Aguilar* and *Spinelli* cases. Both affidavits, however, employ assertions which do meet the reliable informant test:

[T]he magistrate must be informed of . . . some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed . . . was "credible" or his information "reliable."

*Aguilar v. Texas,* 378 U.S. at 114, 84 S.Ct. at 1514.

The information contained in the affidavits in the instant case came from an unnamed informant whom the affiant swore had given reliable information in the past resulting in "several arrests and convictions" and in "recovery of large quantities of stolen property." In *United States v. Jenkins,* 525 F.2d 819 (6th Cir. 1975), this court held that "the general believability of [an informant] may be satisfactorily estab-

lished before a magistrate by the affiant's declaration that the informant has in the past given accurate information. *United States v. Kidd,* 407 F.2d 1316, 1317 (6th Cir. 1969)." *United States v. Jenkins, supra* at 823. See Appendices A and B.

 The second requirement for the affidavit is phrased in these terms:

[The] magistrate must be informed of some of the underlying circumstances from which the informant concluded that the [stolen goods] were where he claimed they were . . . . .

*Aguilar v. Texas,* 378 U.S. at 114–115, 84 S.Ct. at 1514.

On this point the two affidavits we consider told the issuing magistrate the following specifics about the two places to be searched. The affiant swore that he had good cause to believe that certain property —"safes, wigs, TV sets, stereo equipment, gas ranges, weight scales, pistols, microwave ovens. All of this property being stolen in burglaries"—would be found at a frame house occupied by American Machine and Supply Company. (Appendix A). At a warehouse also occupied by American Machine and Supply Company, the affiant had reason to believe other stolen property— "safes-boats-wigs-pistols-TV sets-gas ranges, microwave ovens, weight scales. All of this property being stolen in burglaries"—would be discovered. (Appendix B). Additionally, the affiant stated that "federal agents have searched this [warehouse] for stolen guns on 2/14/74 [one day prior to the filing of this affidavit] and in their search then found a stolen boat, stolen from Easton, Maryland, on 11/26/72." (Appendix B).

 Thus, not only were there two different and detailed listings of goods alleged to be located at the two different locations and a statement that all goods had been "stolen in burglaries," but in addition, there was the confirmation by law enforcement officers themselves of one item of stolen goods, namely, the stolen boat. The facts supplied by both of these affidavits, simultaneously filed and considered by the mag-

istrate, could be taken into account by him in determining probable cause as to each affidavit. *United States v. Nolan*, 413 F.2d 850, 853 (6th Cir. 1969).

■ This, then, speaks of much more knowledge than the mere "rumor circulating in the underworld" about which Mr. Justice Harlan was concerned in *Spinelli*, 393 U.S. 410, at 416, 89 S.Ct. 584. Where there is a significant amount of detail in the affidavit, as in this case, the Magistrate may infer that the informant had personal knowledge or obtained the information in a reliable way. *See United States v. Jenkins*, 525 F.2d 819, 823 (6th Cir. 1975); *United States v. Jensen*, 432 F.2d 861, 863 (6th Cir. 1970).

We have frequently in this circuit cited the commonsense interpretation of the Fourth Amendment set forth in *United States v. Ventresca:*

If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

This is not to say that probable cause can be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the "underlying circumstances" upon which that belief is based. See *Aguilar v. Texas, supra.* [378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964)].

Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. *Jones v. United States* [362 U.S. 257, 270, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960)].

*United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). *See United States v. Sevier*, 539 F.2d 599, 603 (6th Cir. 1976); *United States v. Shropshire*, 498 F.2d 137, 141 (6th Cir. 1974), *cert. denied*, 420 U.S. 901, 95 S.Ct. 838, 42 L.Ed.2d 845 (1975); *United States v. Olt*, 492 F.2d 910, 911–12 (6th Cir. 1974); *United States v. Kidd*, 407 F.2d 1316, 1317 (6th Cir. 1969).

This circuit has also emphasized that the inferences fairly to be drawn from the language of the affidavit are for the Magistrate to draw. *See United States v. Sevier, supra* at 603; *United States v. Manufacturers National Bank*, 536 F.2d 699, 702 (6th Cir. 1976); *United States v. Jenkins*, 525 F.2d 819, 823–24 (6th Cir. 1975); *United States v. Shropshire, supra* at 142.

■ Accepting these rules of law, we believe that the Youngstown Municipal Judge who issued these warrants had both specific information and permissible inferences before him from which he could appropriately find probable cause to believe that the premises concerned were being used at that time for receiving and concealing stolen property and that stolen property would be found there. The motion to suppress evidence was properly denied.

## CLAIMS OF REVERSIBLE ERROR

The most serious of appellant's claims of error appear to us to concern the fact that

the prosecution offered and the District Judge allowed testimony of appellant's involvement in a number of nonfederal crimes. These offenses were receiving, concealing and selling stolen goods other than firearms.

If this testimony was admissible, it must have passed muster under the terms of Rules 403 and 404(b) of the Federal Rules of Evidence:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403.

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b).

Appellant's claims on this issue are not frivolous. On consideration of this record, however, we find that the balance required to be struck weighs sufficiently heavily on the side of admissibility so that we cannot hold that the District Judge abused his discretion in allowing the evidence to be heard.

■ To the extent that appellant's objections to proof of other crimes pertain to the theft, purchase and sale of merchandise (other than guns and ammunition) which was stolen in the hardware store burglary detailed above, we believe admission of this evidence was fully justified as pertaining to the total criminal conspiracy. For example, Mylar's testimony was that all of the loot from the two burglaries on the night of October 24, 1973, including merchandise and guns and ammunition, was sold by him as a package to appellant and Bruno. The fact that part of the merchandise stolen from the McFarland Hardware Store was seized on the premises of the American Machine & Supply Company, which was co-owned by appellant, was certainly probative of the nature of the criminal operation pertaining to the guns and ammunition. As this court held in *United States v. Roberts*, 548 F.2d 665 (6th Cir. 1977):

> The jury is entitled to know the "setting" of a case. It cannot be expected to make its decision in a void—without knowledge of the time, place and circumstances of the acts which form the basis of the charge.

*United States v. Roberts, supra* at 667.

Also, in *United States v. Turner*, 423 F.2d 481 (7th Cir.), *cert. denied*, 398 U.S. 967, 90 S.Ct. 2183, 26 L.Ed.2d 552 (1970), the Seventh Circuit stated:

> [E]vidence of other crimes may be presented when "they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged." *United States v. Wall*, 225 F.2d 905, 907 (7th Cir. 1955).

*United States v. Turner, supra* at 483–84.

Appellant's particular emphasis, however, is upon testimony from Mylar and Helen Terlecky (his girlfriend) and other witnesses concerning events both before and after the particular burglaries which produced the guns and ammunition. Mylar's evidence was clearly the most specific and damaging. It was that appellant and Bruno inspected, priced and bought goods (other than firearms) which Mylar, Marinelli and McGraw had stolen on between 12 and 25 occasions in the months before and after the three burglaries with which the instant indictments are concerned. Mylar also testified that appellant and Bruno bought the loot he showed them "99 percent of the time."

Q. During 1973, how many occasions did you discuss the—your best estimate—stolen merchandise and the sale of it to Mr. Dudek?

A. To Mr. Dudek personally?

Q. Yes, personally.

A. Approximately a dozen times.

Q. How about Mr. Bruno?

A. 50 times.

Q. How many times with Mr. Bruno and Mr. Dudek together?

A. 75 percent of the time they were together.

Q. And did you negotiate the price for these things with them?

A. Yes, sir.

Q. And both of them from time to time discussed the price and the arrangements with you?

A. Yes, sir.

Q. How many times did you deliver stolen merchandise to Mr. Seidita which you had dealt and negotiated with Bruno and Dudek?

A. How many times did I deliver stolen merchandise—

Q. 1973, in other words, how many times did Seidita pick up merchandise for Bruno and Dudek?

A. Several, three, four times that I can think of right off hand.

Q. Who else picked up merchandise for Bruno and Dudek?

A. Other than themselves, no one, just Seidita.

Q. Did they pick up merchandise themselves?

A. Yes, sir.

Q. Both of them?

A. Yes, sir.

> * * * * * *

Q. Now, Mr. Mylar, I would like to call your attention to a time period of 1973, before the firearms transactions, as well as after. I would like you to please refer to that as I ask the questions.

During 1973, did you present or show to Mr. Dudek any other merchandise other than the transactions you have already testified about?

A. Yes.

Q. On how many separate occasions did you do that?

A. To Mr. Dudek?

Q. Either to him directly or while he was present, if you can recall.

A. Possibly 25 occasions.

> * * * * * *

Q. Well, how did you obtain merchandise?

A. Through burglaries.

Q. With whom did you conduct the burglaries?

A. Bob McGraw and Bob Marinelli.

Q. Now, each time, were both McGraw and Marinelli with you during the burglaries?

A. On occasions it was only the three of us, or on different occasions it could be just the two of us, myself and Marinelli or myself and McGraw.

Q. Did you ever show merchandise to Mr. Dudek which was not stolen?

A. Which was not stolen? No, sir.

Q. How many times did you show Mr. Bruno merchandise during that same time period, only the time that you knew Mr. Dudek?

A. 50, roughly, I—50 times.

Q. How many of the times that you saw Mr. Dudek there and showed him stolen merchandise was Mr. Bruno present also?

A. Yes; he was always present.

Q. Always?

A. Right.

Q. Do you ever recall showing Mr. Dudek any merchandise when Mr. Bruno was not present?

A. No, I don't recall.

Q. How many of the occasions that you showed merchandise to Mr. Bruno and Mr. Dudek did they buy it?

A. 99 percent of the time.

We measure the admissibility of this evidence against this court's statement of the rule set forth in *United States v. Ring*, 513 F.2d 1001 (6th Cir. 1975):

> As a general rule, in jury trials, evidence of a criminal defendant's prior misconduct is inadmissible in the prosecution's case in chief to show the accused's bad character or criminal propensity. * * Exceptions to this rule, however, let in evidence of a defendant's prior miscon-

duct to show motive, intent, absence of mistake or inadvertence, identity of the offender or a common plan, pattern or scheme. *United States v. Nemeth*, 430 F.2d 704 (6th Cir. 1970); *United States v. Wells*, 431 F.2d 432 (6th Cir. 1970); *United States v. Birns*, 395 F.2d 943 (6th Cir. 1968); *United States v. Neal*, 344 F.2d 254 (6th Cir. 1965). *See also People v. Molineux*, 168 N.Y. 264, 61 N.E. 286 (1901) (a leading American decision discussing the exceptions). *See generally* 2 J. Wigmore, Evidence §§ 300 et seq. (3d ed. 1940); McCormick, Evidence § 157 (1954); Stone, The Rule of Exclusion of Similar Fact Evidence: America, 51 Harv.L.Rev. 988 (1938). The exceptions when properly applied, are justified by a legitimate need for the evidence that outweighs the perils of undue prejudice to the accused. In reaching this accommodation, the law naturally seeks to shield the accused from unnecessary prejudice. Accordingly, the admission of evidence of a defendant's prior acts of bad conduct, under the specified exceptions, requires limiting instructions cautioning the jury not to consider the evidence for improper purposes. *United States v. Nemeth, supra*; *United States v. Sims*, 430 F.2d 1089, 1092 (6th Cir. 1970).

*United States v. Ring, supra* at 1004. (Footnote omitted.)

Thus if proof of other crimes is justified, it must be justified as an exception to the general rule of nonadmissability. In our instant case the trial judge charged the jury that it could consider this disputed evidence as bearing upon appellant's intent:

If the jury should find beyond a reasonable doubt from the other evidence in the case that the accused did the act charged in the counts of the indictment, then the jury may consider evidence as to an alleged earlier offense of a like nature in determining the state of mind or intent with which the accused did the act charged in the indictment.

Intent is a decision of the mind to knowingly do an act with a conscious objective of accomplishing a specific result. Intent and purpose mean the same thing.

We note that from appellant's counsel's opening statement to the conclusion of the trial, appellant's principal defense was that not he but Bruno alone bought the weapons and ammunition here involved. Bruno was the only witness for the defense and testified that he and not Dudek made the purchases of the stolen weapons and ammunition. Under these circumstances, we cannot say that the District Judge erred by admitting the evidence of other quite similar illegal transactions between the three burglars and the three coconspirators involved in the thefts and disposition of the firearms and ammunition which are the subject matter of the instant indictments. Quite plainly this evidence tended to establish appellant's intentions to engage widely and repeatedly in the business of dealing in stolen goods, including firearms and ammunition.

This evidence was clearly relevant to appellant's defense of lack of criminal intent and was probative of a wider criminal conspiracy [1] among the same conspirators as to which the conspiracy to deal in firearms without a license was a part. Under these circumstances we find no abuse of judicial discretion in the District Judge's admission of proofs of other closely related crimes.

No other issue of asserted reversible error appears to us to merit discussion. We observe that quite obviously witness Bruno was not intimidated by the government's request to withdraw immunity since such evidence as he gave was entirely consistent with defendant's case.

The judgments of conviction are affirmed.

JOHN W. PECK, Circuit Judge, concurring.

I concur in the majority opinion and in the conclusion that the district judge did

---

1. The Supreme Court has recognized that evidence of prior crimes may be "particularly probative" to show "a system of criminal activity." *Spencer v. Texas*, 385 U.S. 554, 560–61, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967).

not commit an abuse of discretion by admitting evidence of other, nonfederal crimes of appellant, on the ground that under Federal Rule of Evidence 404(b), the probative value of the contested evidence outweighed its prejudicial impact. "[W]hen reviewing a district court's ruling on the admissibility of evidence under Rule 404(b), the central question is whether the trial court abused its discretion in determining that the probative value of the evidence outweighed its potential prejudicial effect." *United States v. Czarnecki*, 552 F.2d 698, 702 (6th Cir. 1977); *United States v. McFadyen-Snider*, 552 F.2d 1178, 1183 (6th Cir. 1977); *United States v. Riggins*, 539 F.2d 682 (9th Cir. 1976); Federal Rules of Evidence 404(b), Advisory Committee Note.

However, I express reservations concerning the statement, "We measure the admissibility of this evidence against this court's statement of the rule set forth in *United States v. Ring*, 513 F.2d 1001 (6th Cir. 1975) . . . .", because *Ring* was not decided under Federal Rule of Evidence 404(b), which had not then gone into effect. Although the portion of *Ring* quoted in the opinion is not in conflict with Rule 404(b), the fact remains that *Ring* stated the rule in this Circuit *prior* to the adoption of the Federal Rules of Evidence.

While it may be true that, as the present case illustrates, the wise application of the *Ring* rule as opposed to the application of Rule 404(b) would not necessarily lead to different results, there still may be some difference between the two. Under *Ring* the other crimes or bad acts generally had to have been substantially similar, had to have occurred at about the time of the offense charged, and motive or lack of mistake had to have been in issue, but these requirements were not incorporated in Rule 404(b) as a rigid checklist. See also *U. S. v. Nemeth*, 430 F.2d 704, 705 (6th Cir. 1970). "The Advisory Committee Note to Rule 404(b) states that '[n]o mechanical solution is offered' to the question of determining when the rule permits the introduction of evidence of other crimes or bad acts." *United States v. Czarnecki, supra*, 552 F.2d at 702; *United States v. McFadyen-Snider,*

*supra*, 552 F.2d at 1183. In *Czarnecki*, this Court held the district court did not abuse its discretion in admitting into evidence testimony that could have suggested that appellant Czarnecki had engaged in other crimes by hiring a notorious character on other occasions. Therein the relationship between appellant Czarnecki and the notorious character was a crucial issue, and the evidence, although of possibly dissimilar acts, was held to be more probative than prejudicial.

## APPENDIX A

Whereas there has been filed with me an affidavit of which the following is a copy:

Before me, Leo P. Morley, a Judge of the Municipal Court of Youngstown, Ohio, personally came one Detective James De Angelo who being first duly sworn according to law deposes and says: That he believes and has good cause to believe that on or about the 15th day of February, 1974, in the City of Youngstown, Mahoning County, State of Ohio, Certain property to-wit: safes, wigs, TV sets, stereo equipment, gas ranges, weight scales, pistols, microwave ovens. All of this property being stolen in burglaries.

In a house, building or place, described as follows, to-wit: 1023 Bentley Avenue, Youngstown, Ohio. A two story frame house whose bills are paid by the AM Machine & Supply Company of 1021½ Ravenna Avenue is occupied by John Doe aka AM Machine and Supply Co., 1023 Bentley Avenue.

The affiant says that he has good reasons to believe and does believe that the aforesaid property or some part thereof is still kept or concealed at the place aforesaid, and that there is urgent necessity for the search thereof to be made in the daytime. This affidavit is based on fact as follows: Information received from an informant, who in the past has given reliable information that resulted in several arrests and convictions. In addition said informant has given information in the past on numerous occasions that resulted in the recovery of large quantities of stolen property.

**1298**

/s/ DET. JAMES DE ANGELO
Affiant

Sworn to before me by said Detective James De Angelo affiant and subscribed in my presence this 15th day of February, 1974.

/s/ LEO P. MORLEY
Judge

APPENDIX B

Whereas there has been filed with me an affidavit of which the following is a copy:

Before me, Leo P. Morley, a Judge of the Municipal Court of Youngstown, Ohio, personally came one Detective James De Angelo who being first duly sworn according to law deposes and says: That he believes and has good cause to believe that on or about the 15th day of February, 1974, in the City of Youngstown, Mahoning County, State of Ohio, Certain property to-wit: safes—boats—wigs—pistols—TV sets—gas ranges, microwave ovens, weight scales. All at this property being stolen in burglaries.

In a house, building or place, described as follows, to-wit: 1021½ Ravenna Avenue, Youngstown, Ohio a cement block building with aluminum siding; also attached to this structure an office, street No. 121 Ravenna Avenue is occupied by Joe Doe aka AM Machine and Supply Co., 1023 Bentley Avenue.

The affiant says that he has good reasons to believe and does believe that the aforesaid property or some part thereof is still kept or concealed at the place aforesaid, and that there is urgent necessity for the search thereof to be made in the daytime. This affidavit is based on facts as follows: Information received from an informant, who in the past has given reliable information that resulted in several arrests and convictions, in addition said informant has given information in the past on numerous occasions that resulted in the recovery of large quantities of stolen property. Also that Federal Agents have searched this establishment for stolen guns on 2/14/74 and in their search then found a stolen boat, stolen from Easton, Maryland on 11/26/72.

/s/ DET. JAMES DE ANGELO,
Affiant

Sworn to before me by said Detective James De Angelo affiant and subscribed in my presence this 15th day of February, 1974.

/s/ LEO P. MORLEY, Judge