**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.) No. 20-0984** (Monongalia County 20-F-37)

**Michael Matamala,**
**Defendant Below, Petitioner**

**MEMORANDUM DECISION**

Petitioner Michael Matamala, by counsel John C. Rogers, appeals the October 29, 2020, sentencing order of the Circuit Court of Monongalia County. Respondent State of West Virginia, by counsel Patrick Morrisey and Andrea Nease Proper, filed a response in support of the circuit court's order.

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

By indictment dated January 10, 2020, petitioner was charged in the Circuit Court of Monongalia County with the following offenses which were allegedly committed on October 30, 2019: (1) domestic battery, third or subsequent offense, against his mother, Diana Matamala, "by striking and/or shoving her, after he had previously been convicted three [separate] times of [d]omestic [b]attery or [d]omestic [a]ssault" during 2015 and 2016, pursuant to West Virginia Code § 61-2-28(d); and (2) interfering with emergency communications "by taking [Diana Matamala]'s phone during an emergency," pursuant to West Virginia Code § 61-5-17(n).

On March 20, 2020, the State filed a notice pursuant to Rule 404(b) of the West Virginia Rules of Evidence providing that it intended to introduce at trial petitioner's prior bad acts from

1

2015, 2016, and 2019, which included domestic battery and/or assault against his mother, interfering with emergency communications, and violations of protective orders. The State alleged that "the prior bad acts are relevant to show [petitioner]'s motive and intent to commit the alleged offense[s] against [Diana Matamala], as he has made numerous [prior] threats of violence" that included "threaten[ing] violence if she called the police." The State argued that the prior bad acts could also be admitted at trial because they were necessary to "complete the story" and "illustrate the context of the offense[s]."

Following a hearing, the circuit court, by order entered on July 27, 2020, found that petitioner's prior bad acts were admissible at trial as "the State's intended 404(b) evidence illustrates and depicts motive for the crime[s]." The circuit court further found that "the State had a right to present a 'complete story' to the jury" and "[petitioner]'s prior actions serve[d] as an explanation of the current offense[s]."

At petitioner's August 27, 2020, trial, the State indicated a willingness to stipulate to petitioner's prior convictions for domestic battery and/or assault so that it would not have to produce proof of such convictions necessary to establish petitioner's guilt as to count one of the indictment. Petitioner refused to stipulate to two or more of his prior convictions, stating that while he understood that the evidence of the prior convictions could be prejudicial, he believed that, "if these things are explained, . . . it will give a better explanation for what happened this time."[1] Accordingly, the circuit court permitted the State to show that petitioner had previously been convicted three separate times of domestic assault during 2015 and 2016 through documentary evidence and the testimony of the clerk of the Magistrate Court of Monongalia County and a deputy circuit court clerk.

Next, the State presented the testimony of petitioner's mother. On direct examination, petitioner's mother testified as follows: She lived in a mobile home in Granville, West Virginia. Petitioner was not allowed to live in her home because "he was on drugs" and she "was fearful of him." On October 30, 2019, she received a communication from petitioner that he wanted to again reside with her. Petitioner's mother testified that she informed petitioner that he could not return to her home, and "I made it clear I did not want him to come home." Later that same day, after petitioner's mother left work, her neighbor picked her up from the bus stop. Petitioner's mother asked the neighbor (who was male) to accompany her inside her residence "because I was worried that [petitioner] might have got in the back door and be there because he had kept wanting— insisted on coming home." Petitioner was inside in his mother's residence when she and her neighbor entered her home. Petitioner's mother allowed the neighbor to leave, but informed petitioner that "[y]ou're not supposed to be here." Petitioner's mother testified that she "was afraid to do or say much that would get anything set off, so I just made it clear that he wasn't supposed to be there."

Later that evening, while petitioner's mother was on the phone with her older son, "for some reason, [petitioner] got angry." When petitioner began to yell, petitioner's mother had her

[1]In refusing to stipulate to two or more of his prior convictions, petitioner acted contrary to the advice of his trial counsel.

2

phone and "started to go toward the door." Petitioner's mother stated that petitioner "jumped up and grabbed my phone." Petitioner informed his mother, "You're going to call the police. You're not going out anywhere. You're going to stay right here." Petitioner proceeded to throw his mother on the floor twice. The first time petitioner threw his mother to the floor, "it hurt." While petitioner's mother was able to get off the floor, standing back up "was hard." Petitioner told his mother, "You're going to call the cops on me again. I'm not going to jail. You're not getting out of here." Thereafter, petitioner threw his mother to the floor the second time. Petitioner's mother testified that she landed on the floor "[a]bout the same way." Petitioner's mother told him that she was not going to call the police or run out of the house and that she was unable to call the police because "[y]ou have my phone."

Petitioner then threw his mother onto the couch and punched her in the face "two to three times." While petitioner's mother was on the couch, she asked herself whether petitioner was "going to kill me." Following the attack on the couch, petitioner grabbed his mother, took her to the bathroom, turned on the shower, and directed her to get in the shower. Petitioner told his mother, "Now[,] you know—now you see what it's like to be in jail and have a cold shower." After forcing his mother to take a cold shower, he allowed her to returned to the living room and sit on the couch. Petitioner subsequently fell asleep on the loveseat. Petitioner's mother stayed on the couch and "just prayed."

The following morning, petitioner's mother got up when it was time for her to go to work. She testified that she was barely able to walk due to lower back pain and that she "was able to see the marks on my face, my lip, [and] my eye." Petitioner was still asleep on the loveseat. Petitioner's mother believed that petitioner probably had not slept for "quite a few days from the drugs." Petitioner's mother retrieved her phone from "close to" petitioner and "slipped out" of her home "as quietly as I could." During her direct examination, petitioner's mother confirmed that petitioner "didn't give [me] the phone back" and that, during the previous night's attack, petitioner told her that, "[i]f you call the cops on me, I'll kill you." She testified that, at the time of petitioner's threat, she believed him.

After retrieving her phone, petitioner's mother did not initially contact the police. Petitioner's mother "was afraid if I called them that nothing was going to be done that—and that it would just make things worse because it had happened before." Petitioner's mother attempted to take the bus to work, but decided that she could not tolerate the ride due to the bus's movement and her back pain. At a stop at the bus terminal, petitioner's mother called a female neighbor to give her a ride to work. Once at work, petitioner's mother called her daughter in North Carolina, who wanted to report petitioner to the police. Petitioner's mother told her daughter to "[g]o ahead," and her daughter called the police. Detective Ronald Kerns of the Granville Police Department first called petitioner's mother and then responded to her workplace. Detective Kerns took photographs of petitioner's mother's facial injuries, and she told the detective that her back was hurting. At the conclusion of her direct examination, petitioner's mother testified that October 30, 2019, was not the first time petitioner harmed her and threatened her. She confirmed that he had been previously convicted of domestic assault against her.

During her cross-examination, petitioner's mother testified that she allowed her male

3

neighbor to leave her residence in the evening of October 30, 2019, because, while petitioner was in the house, he "was seemingly calm." However, petitioner's mother believed that petitioner was on drugs "[b]ecause he had been on meth before, and I knew . . . the way he acted." Petitioner's mother further testified that she found illegal drugs "in the trailer with him before." With regard to her back, petitioner's mother stated that she did not notice bruising on her back until after she spoke with Detective Kerns, but informed him that her back was hurting "at the time he interviewed [me]." Petitioner's mother confirmed that petitioner "knew for a fact he was not supposed to be at my residence."

Petitioner's counsel also asked his mother to explain why she did not contact the police when she found petitioner in her home during the evening of October 30, 2019, and why she did not contact the police herself the following morning. Regarding petitioner's presence in her home on October 30, 2019, petitioner's mother replied that "I had called a couple of weeks before, and it didn't change a thing" and that, "when that happens and nothing is done, I become more of a target." Regarding her daughter's call to the police the following morning, petitioner's mother indicated that, because the police informed her that "there was nothing they could do about it" when she contacted them about petitioner pushing her approximately two weeks prior to the October 30, 2019, incident, she "figured" that, if she reported petitioner again, "it's going to make it worse for me," and he would "blame me more."

During her redirect examination, petitioner's mother testified that calling 911 and obtaining protective orders against petitioner made her "a bigger target" and resulted in no change in petitioner's behavior towards her. Consequently, "every day," petitioner's mother had "to make a decision whether or not to call for help."

The State's last witness was Detective Kerns. Detective Kerns testified that, when he arrived at petitioner's mother workplace, she was clearly upset, and he was "able to observe obvious injuries to her face." The photographs taken by Detective Kerns of petitioner's mother's facial injuries were admitted and published to the jury.[2] Detective Kerns stated that her injuries were "consistent with the statement provided by [her]," and he confirmed that petitioner's mother told him her back was hurting. During his cross-examination, Detective Kerns testified that petitioner's mother did not mention any bruising of her back during his interview of her and that "I would not have taken those photographs anyway because she would have had to remove some clothing." Detective Kerns stated that it was possible that petitioner's mother's injuries were not caused by petitioner. During his redirect examination, the State asked Detective Kerns, "[b]ased on the investigation, did you see any other cause of those injuries that was within reason?" Detective Kerns confirmed that "[petitioner's mother's] injuries were consistent with what she told me."

Petitioner declined to testify on his own behalf and presented no other evidence. The jury ultimately found petitioner guilty of domestic battery, third or subsequent offense, and interfering with emergency communications. By sentencing order entered on October 29, 2020, the circuit court imposed a term of one to five years of incarceration for domestic battery, third or subsequent

---

[2]Petitioner did not include the photographs of his mother's facial injuries in his appendix.

offense, and a term of one year of incarceration for interfering with emergency communications. The circuit court ran petitioner's sentences consecutive to each other.

Petitioner now appeals the circuit court's October 29, 2020, sentencing order. "On an appeal to this Court[,] the appellant bears the burden of showing that there was error in the proceedings below resulting in the judgment of which he complains, all presumptions being in favor of the correctness of the proceedings and judgment in and of the trial court." Syl. Pt. 1, *White v. Haines*, 215 W. Va. 698, 601 S.E.2d 18 (2004) (quoting Syl. Pt. 2, *Perdue v. Coiner*, 156 W. Va. 467, 194 S.E.2d 657 (1973)).

On appeal, petitioner raises two assignments of error. Petitioner initially argues that the circuit court erred in admitting, pursuant to Rule 404(b),[3] his prior bad acts from 2015, 2016, and 2019, which include domestic battery and/or assault against his mother, interfering with emergency communications, and violations of protective orders. Specifically, petitioner argues that such evidence was unfairly prejudicial. The State counters that, while balancing the relevance of extrinsic evidence against its prejudicial effect under Rule 403 of the Rules of Evidence is a part of a Rule 404(b) analysis,[4] such analysis is not necessary in this case because the prior bad acts

---

[3]Rule 404(b) of the Rules of Evidence provides, in pertinent part:

(b) *Crimes, wrongs, or other acts.*

(1) *Prohibited uses.*—Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) *Permitted uses; notice required.*—This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Any party seeking the admission of evidence pursuant to this subsection must:
(A) provide reasonable notice of the general nature and the specific and precise purpose for which the evidence is being offered by the party at trial; . . . .

[4]Rule 403 of the Rules of Evidence provides, in pertinent part, that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice[.]" In Syllabus Point 2 of *State v. McGinnis*, 193 W. Va. 147, 455 S.E.2d 516 (1994), we held that:

Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an *in camera* hearing as stated in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that

(continued . . .)

5

were admissible as intrinsic evidence. We agree with the State.

"The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syl. Pt. 2, *State v. Harris*, 230 W. Va. 717, 742 S.E.2d 133 (2013) (quoting Sy. Pt. 10, *State v. Huffman*, 141 W. Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds*, *State ex rel. R.L. v. Bedell*, 192 W. Va. 435, 452 S.E.2d 893 (1994)).

In granting the State's motion for the admission of petitioner's prior bad acts, the circuit court ruled, in pertinent part, that the jury was entitled to hear the complete story of the interactions between petitioner and his mother as an explanation of the instant offenses. This Court in *Harris* explained that:

> One of the accepted bases for the admissibility of evidence of other crimes arises when such evidence "furnishes part of the context of the crime" or is necessary to a "full presentation" of the case, or is so intimately connected with and explanatory of the crime charged against the defendant and is so much a part of the setting of the case and its "environment" that its proof is appropriate in order "to complete the story of the crime on trial by proving its immediate context or the 'res gestae'" or the "uncharged offense is 'so linked together in point of time and circumstances with the crime charged that one cannot be fully shown without proving the other . . .' (and is thus) part of the res gestae of the crime charged." And where evidence is admissible to provide this "full presentation" of the offense, "(t)here is no reason to fragmentize the event under inquiry" by suppressing parts of the "res gestae." As the Court said in *United States v. Roberts*, 548 F.2d 665, 667 (6th Cir. 1977), . . . "(t)he jury is entitled to know the 'setting' of a case. It cannot be expected to make its decision in a void without knowledge of the time, place and circumstances of the acts which form the basis of the charge."

230 W. Va. at 721-22, 742 S.E.2d at 137-38 (quoting *U.S. v. Masters*, 622 F.2d 83, 86 (4th Cir. 1980) (Internal citations omitted.); *State v. LaRock*, 196 W. Va. 294, 312 n.29, 470 S.E.2d 613,

---

the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). *If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence.* If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

(Emphasis added.).

631 n.29 (1996) (same).

Petitioner was charged with domestic battery, third or subsequent offense, and count one of the indictment listed his prior convictions for domestic assault from 2015 and 2016. Count two specifically alleged that petitioner interfered with his mother's emergency communications by taking her phone away. During her testimony, petitioner's mother explained (1) why she did not contact the police when she found petitioner in her home during the evening of October 30, 2019, before petitioner took her phone; and (2) why she did not contact the police herself the following morning after she had retrieved her phone based upon her prior interactions with petitioner. For example, during her cross-examination, petitioner's mother explained that, she called the police following an earlier incident where petitioner pushed her and they did nothing, which made petitioner more of a threat to her.

"Rule 403 was not intended to prohibit a prosecutor from presenting a full picture of a crime especially where the prior acts have relevance independent of simply proving the factors listed in Rule 404(b)." *LaRock*, 196 W. Va. at 313, 470 S.E.2d at 632. *See also U.S. v. McNair*, 605 F.3d 1152, 1206 (11th Cir. 2010) ("Because the other acts evidence was inextricably intertwined with the charged crimes, it was not excludable under Rule 403."). Furthermore, based upon on our review of the trial transcript, we agree with the State that it did not unduly dwell on petitioner's prior bad acts in a case where it had to prove his previous convictions for domestic assault due to petitioner's refusal to stipulate to them. Therefore, we conclude that evidence of petitioner's prior bad acts constituted intrinsic evidence, inextricably intertwined with the acts charged in the indictment, and that the circuit court did not abuse its discretion in admitting such evidence.

As for petitioner's second assignment of error, he generally argues that there was insufficient evidence to support his conviction for domestic battery, third or subsequent offense, pursuant to West Virginia Code § 61-2-28(d),[5] and his conviction for interfering with emergency communications pursuant to West Virginia Code § 61-5-17(n).[6] We disagree as we have held that:

[5]"Domestic battery" occurs where "[a]ny person . . . unlawfully and intentionally makes physical contact of an insulting or provoking nature with his or her family or household member, or unlawfully and intentionally causes physical harm to his or her family or household member." W. Va. Code § 61-2-28(a). West Virginia Code § 61-2-28(d) provides, in pertinent part:

> Any person who has been convicted of a third or subsequent violation of the provisions of [West Virginia Code § 61-2-28(a)] or [West Virginia Code § 61-2-28(b), relating to the lesser included offense of domestic assault] . . . , where the victim was . . . a parent . . . is guilty of a felony if the offense occurs within ten years of a prior conviction of any of these offenses and, upon conviction thereof, shall be confined in a state correctional facility not less than one nor more than five years or fined not more than $2,500, or both fined and confined.

[6]West Virginia Code § 61-5-17(n) provides:
(continued . . .)

[t]he function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

. . . .

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. . . .

Syl. Pts. 1 and 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

Furthermore, "[a]n appellate court may not decide the credibility of witnesses or weigh

---

(1) No person, with the intent to purposefully deprive another person of emergency services, may interfere with or prevent another person from making an emergency communication, which a reasonable person would consider necessary under the circumstances, to law-enforcement, fire, or emergency medical services personnel.

(2) For the purpose of this subsection, the term "interfere with or prevent" includes, but is not limited to, seizing, concealing, obstructing access to or disabling or disconnecting a telephone, telephone line, or equipment or other communication device.

(3) For the purpose of this subsection, the term "emergency communication" means communication to transmit warnings or other information pertaining to a crime, fire, accident, power outage, disaster, or risk of injury or damage to a person or property.

(4) A person who violates this subsection is guilty of a misdemeanor and, upon conviction thereof, shall be confined in jail for a period of not less than one day nor more than one year or shall be fined not less than $250 nor more than $2,000, or both fined and confined.

8

evidence as that is the exclusive function and task of the trier of fact" and, "[o]nce the jury has spoken, this Court may not review the credibility of the witnesses." *Id.* at 669 n.9, 461 S.E.2d at175 n.9. Based upon our review of the record, we find that the testimony and documentary evidence presented at trial, was more than sufficient for a rational jury to find petitioner guilty of domestic battery, third or subsequent offense, and interfering with emergency communications.

For the foregoing reasons, we affirm the circuit court's October 29, 2020, sentencing order.

Affirmed.

**ISSUED:** March 9, 2022

**CONCURRED IN BY:**

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice Alan D. Moats sitting by temporary assignment