**UNITED STATES of America, Appellant,**

v.

**Robert DOBSON.**

No. 77-2378.

United States Court of Appeals, Third Circuit.

Argued March 31, 1978.

Decided Aug. 2, 1978.

Certiorari Denied Oct. 10, 1978.
See 99 S.Ct. 264.

---

David W. Marston, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, App. Section, Theodore A. McKee, Asst. U. S. Atty., Philadelphia, Pa., for appellant.

Alan A. Turner and Douglas Riblet, Asst. Defenders, Federal Court Div., Defender Association of Phila., Philadelphia, Pa., for appellee.

Before HUNTER, WEIS, and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This appeal presents an issue of first impression: does the Interstate Agreement on Detainers Act (Act)[1] apply to a parole violator detainee prior to any parole revocation hearing, and thus prior to the time that parole is actually revoked? The district court answered this question in the affirmative. We reverse, and hold that a putative parole violator held in custody pursuant only to a parole violation warrant does not come within the provisions of the Act.

I.

Robert Dobson, who had been on parole after serving a portion of his state-imposed 7½ to 21 year sentence, was apprehended for violating certain state and federal statutes. After his arrest for committing the state offenses,[2] Dobson posted bail pertaining to those offenses only. Despite this posting of bail, Dobson was nevertheless held in state custody as a technical parole violator pursuant to a state parole violation warrant. See Pa.Stat.Ann. tit. 61, § 331.-21a(b) (Purdon 1964).

On June 7, 1977, a federal detainer was lodged against Dobson[3] in connection with a magistrate's complaint under which Dob-

---

1. Pub.L. No. 91–538, §§ 1–8, 84 Stat. 1397–1403 (1970) (codified at 18 U.S.C. App. 1395–98 (1976)).

2. The state offenses charged included theft by deception, unlicensed possession of a firearm, and possession of a controlled substance.

3. As the Supreme Court noted in *United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978), the Act does not define the word "detainer." "The House and Senate reports, however, explain that '[a] detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction.' H.R.Rep. No. 91–1018, p. 2; S.Rep. No. 91–1356, p. 2." *United States v. Mauro*, 436 U.S. at 359, 98 S.Ct. at 1846.

   In *Mauro*, the Supreme Court held that obtaining a prisoner from another jurisdiction by way of a writ of habeas corpus *ad prosequendum* will not trigger the operation of the Act unless a *detainer* has been lodged with the authority holding the prisoner.

son was then charged. Two federal writs of habeas corpus *ad prosequendum* issued, and Dobson appeared at a federal bail hearing, and a probable cause hearing. At the conclusion of each proceeding, Dobson was returned to state facilities.

Thereafter, on July 6, 1977, while Dobson was still in state custody, a four-count federal indictment which superseded the ·magistrate's complaint was returned against Dobson. It charged him in two counts with possession and utterance of counterfeit United States currency,[4] possession of a firearm by a felon,[5] and possession of methamphetamine with intent to distribute.[6] Pursuant to a third writ of habeas corpus *ad prosequendum,* Dobson appeared at an arraignment on the indictment. Then, on July 15th, another detainer was lodged by federal officials with state authorities, this time based on the federal indictment. No writ *ad prosequendum* was filed after this second detainer was lodged.[7]

On August 29, 1977, Dobson moved to dismiss the federal indictment on the ground that his return to state custody following each appearance in federal court violated Article IV(e) of the Act.[8] The district court agreed with Dobson, and ruled that the Act included within its ambit a parole violator detainee. Accordingly, on September 16, 1977, pursuant to Article IV(e) of the Act, the district court dismissed the federal indictment which had been returned against Dobson.

On November 30, 1977, the Pennsylvania Board of Probation and Parole rescinded its earlier action which had ordered that Dobson's parole revocation hearing be scheduled. Instead the Board determined that Dobson should be continued on parole.

4. In violation of 18 U.S.C. § 472.

5. In violation of 18 U.S.C. App. § 1202(a)(1).

6. In violation of 21 U.S.C. § 841(a)(1).

7. An examination of the Magistrate's complaint (77–535–M–2) which was superseded by the indictment (77–283) reveals only one overlapping count reflected in both documents—a violation of 18 U.S.C. § 472 (passing and uttering counterfeit U.S. currency). It is not clear however whether one or two counts involving § 472 were charged in the magistrate's complaint.

Neither party brought the facts concerning the Magistrate's complaint or the superseding indictment to our attention. Nor did either party evaluate the operation of the Act in relation to the precise dates when the particular detainers and writs *ad prosequendum* were filed relative to the documents and charges on which they were based. *See United States v. Mauro, discussed in* n.3 *supra.*

Indeed it was not until *after* the Supreme Court had decided *Mauro* (more than two months following oral argument in this case) that we were informed that federal officials had lodged detainers with the state authorities holding Dobson. Until the record was supplemented on appeal to reflect the lodging of detainers, we remained under the impression from the initial submissions (and from oral argument) that only the writs of habeas corpus *ad prosequendum* had operated, and were relied upon, as detainers. It was primarily for that reason that we withheld disposition of this appeal pending the Supreme Court's decision in *Mauro.*

While *Mauro* and the supplement to the record have now clarified to our satisfaction the actual basis for Dobson's appearances in federal court, there has been no recognition by the parties of additional issues that may be relevant to the relationship between the original detainer lodged against Dobson based on the complaint and the subsequent detainer based on the indictment. This was of course the same indictment which was dismissed by the district court, even though no writ of habeas corpus *ad prosequendum* had issued in connection with the detainer based on that indictment. We are however reluctant to dispose of issues not raised or briefed by the parties. *Stotter & Co., Inc. v. Amstar Corp.,* 579 F.2d 13 at 20 (3d Cir. 1978) (opinion sur petition for panel rehearing); *see Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *cf. System Operations, Inc. v. Scientific Games Dev. Corp.,* 555 F.2d 1131, 1144 n.17 (3d Cir. 1977) (court refused to consider the effect of a document not made part of the record). We need not reach the problems to which we have adverted because of the ground on which we dispose of Dobson's claim.

8. That provision reads:

If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to article V(e), hereof, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

## II.

The Act prescribes the procedure that must be followed when one state (here, the federal authority and receiving state) lodges a detainer with another state in which the detainee is incarcerated (here, Pennsylvania, the sending state), and thereafter requests the appearance of the detainee for proceedings in the receiving state.[9] Concomitantly, the Act affords certain protections to the detainees who are transferred from one jurisdiction to another. One such protection provides for the dismissal of a receiving state's indictment when the receiving state, before trial in that state, returns a prisoner to the original place of his confinement. Art. IV(e).[10]

The provisions of the Act however apply only to a "prisoner" who is "serving a term of imprisonment". Art. IV(a).[11] Dobson accordingly claims that he, as a parolee whose parole has been threatened with revocation and who is incarcerated pursuant to a parole violation warrant, is indeed "serving a term of imprisonment." He contends that inasmuch as his confinement "stems solely from the existence of a term of imprisonment previously imposed" (the balance of his 7½ to 21 year sentence), he was "serving a term of imprisonment when the Parole Board had achieved his incarceration," and therefore comes within the provisions of the Act. Appellee's Brief at 7.

■ The Government, on the other hand, argues that the provisions of the Act apply only when imprisonment is pursuant to a final determination of guilt; therefore a parole violation detainer, being temporary and contingent in character, is not the equivalent of such a final determination as would constitute the requisite condition prescribed by the statute, namely service of a term of imprisonment. Government's Brief at 6. While we are not attracted to any of the other arguments made by the Government in its brief, we are persuaded that a parolee who is confined awaiting a parole revocation hearing is not serving a term of imprisonment within the intendment of the Act.

### A.

It seems clear to us that the natural meaning of the phrase "serving a term of imprisonment" denotes no more or less than that definable period of time during which

---

**9.** In 1970 Congress enacted the Interstate Agreement on Detainers Act, 18 U.S.C. App., pp. 1395–1398 (1976), joining the United States and the District of Columbia as parties to the Interstate Agreement on Detainers (Agreement). The Agreement, which has also been enacted by 46 States, is designed "to encourage the expeditious and orderly disposition of . . . charges [outstanding against a prisoner] and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints." Art. I. It prescribes procedures by which a member State may obtain for trial a prisoner incarcerated in another member jurisdiction and by which the prisoner may demand the speedy disposition of certain charges pending against him in another jurisdiction. In either case, however, the provisions of the Agreement are triggered only when a "detainer" is filed with the custodial (sending) State by another State (receiving) having untried charges pending against the prisoner; to obtain temporary custody, the receiving State must also file and appropriate "request" with the sending State. . . .

*United States v. Mauro,* 436 U.S. at 343, 98 S.Ct. at 1838 (footnote omitted).

The structure and purposes of the Act are explained in *United States v. Mauro,* 436 U.S. at 340, 98 S.Ct. 1834; *United States v. Ford,* 550 F.2d 732, 737–41 (2d Cir. 1977), aff'd sub nom. *United States v. Mauro, supra* ; and *United States ex rel. Esola v. Groomes,* 520 F.2d 830, 833–34 (3d Cir. 1975).

**10.** *Quoted n.8 supra.*

**11.** Article IV(a) of the Agreement provides in relevant part:

The appropriate officer of the jurisdiction in which an untried indictment, information, or complaint is pending shall be entitled to have a *prisoner* against whom he has lodged a detainer and *who is serving a term of imprisonment* in any party State made available in accordance with article V(a) hereof upon presentation of a written request for temporary custody or availability to the appropriate authorities of the State in which the prisoner is incarcerated. . . .

(Emphasis added.) *Accord,* Art. III(a) (prescribing the procedure for the initiation of proceedings in the receiving state by a party who has "entered upon a term of imprisonment" in the sending state).

a prisoner must be confined in order to complete or satisfy the *prison term or sentence* which has been ordered. Thus, the very words of the statute would appear to exclude those held in custody for periods of time which are not defined in terms of duration, which are not certain, and which do not follow a conviction or determination of parole revocation. Hence even though we recognize that the basis for a parolee's detention is the underlying sentence from which he has been paroled, until such time that the parole violator is recommitted after a hearing, and his incarceration thereby made certain and fixed as to duration, no term of imprisonment can be said to have commenced or resumed. In this respect a parole violator is no different than a pretrial detainee who is merely awaiting trial and who, until conviction and sentencing, cannot commence service of a term of imprisonment.

Indeed, until conviction at trial and the imposition of a sentence, the length of the pretrial detainee's confinement is uncertain. So too, until a parole revocation hearing has been held, and the parole violator's parole is revoked and he is recommitted, his status with respect to confinement is similarly uncertain.[12] In short, just as pretrial incarceration is a transitory and impermanent state, incarceration pursuant to a parole violation warrant is just as transitory and impermanent. Both place the prisoner in no more than a "holding pattern."

Primarily for this reason, various courts, both state and federal, have unanimously refused to extend the Act to reach detainees awaiting trial. *United States v. Harris,* 566 F.2d 610, 612–13 (8th Cir. 1977); *United States v. Roberts,* 548 F.2d 665, 669–71 (6th Cir.), *cert. denied,* 431 U.S. 931, 97 S.Ct. 2636, 53 L.Ed.2d 246 (1977); *United States v. Evans,* 423 F.Supp. 528, 531 (S.D.N.Y. 1976), *aff'd,* 556 F.2d 561 (2d Cir. 1977)

(without written opinion); *Seymour v. State,* 21 Ariz.App. 12, 515 P.2d 39 (1973); *Davidson v. State,* 18 Md.App. 61, 305 A.2d 474, 479 (1973); *People v. Butcher,* 46 Mich. App. 40, 45, 207 N.W.2d 430, 433 (1973); *Cresong v. Nevil,* 51 A.D.2d 1096, 381 N.Y. S.2d 355 (1976). In so doing, they have recognized, as do we, that a pretrial detainee "has no immediate interest in any institutional treatment or program of rehabilitation." *United States v. Harris,* 566 F.2d at 613, *quoting United States v. Roberts,* 548 F.2d at 670–71. This lack of interest obviously stems from the uncertain and contingent nature of a confinement which is dependent both upon the outcome of trial and the imposition of a jail sentence. *See United States v. Harris,* 566 F.2d at 613; *United States v. Roberts,* 548 F.2d at 670–71. In discussing the exclusion of pretrial detainees from the ambit of the Act, Judge Lively, writing for the Sixth Circuit, concluded:

> the Agreement is only concerned that a sentenced prisoner who has entered into the life of the institution to which he has been committed for a term of imprisonment not have programs of treatment and rehabilitation obstructed by numerous absences in connection with successive proceedings related to pending charges in another jurisdiction. There is no indication in the language of the Agreement or in the legislative history that its provisions were intended to apply to persons being detained for trial who are not serving prison sentences.

*Id.* at 671.

### B.

This "holding pattern" status assumes substantial significance when we examine the purposes of the Act—purposes to which we have already adverted in discussing the status of a pretrial detainee. Our court has

---

12. The parties have proffered no evidence as to the likelihood that the parole of a technical violator would be revoked. Some years ago however the Supreme Court observed that "[i]t has been estimated that 35%–45% of all parolees are subjected to revocation and return to prison." *Morrissey v. Brewer,* 408 U.S. 471,

479, 92 S.Ct. 2593, 2599, 33 L.Ed.2d 484 (1972), *citing* President's Commission of Law Enforcement and Administration of Justice, Task Force Report: Corrections 62 (1967). We, of course, cannot vouch for the present validity of these statistics, but we would not be surprised if the percentage remained relatively constant.

previously emphasized that a major purpose of the Act is "to minimize the interference with a prisoner's treatment and rehabilitation." *United States ex rel. Esola v. Groomes,* 520 F.2d 830, 833 (3d Cir. 1975). *Accord,* S.Rep. No. 1356, 91st Cong., 2d Sess., *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 4864, 4864–66; H.R.Rep. No. 1018, 91st Cong., 2d Sess. (1970). The Supreme Court explained the objectives of the Act (Agreement) as follows:

> In recommending the adoption of the Agreement, the Council of State Governments outlined some of the problems caused by detainers that the Agreement was designed to address. It noted that prison administrators were 'thwarted in [their] effort[s] toward rehabilitation [because t]he inmate who has a detainer against him is filled with anxiety and apprehension and frequently does not respond to a training program.' Furthermore, the prisoner was often deprived of the ability to take advantage of many of the prison's programs aimed at rehabilitation, merely because there was a detainer lodged against him. This problem was noted by the Director of the Federal Bureau of Prisons, who in 1959 stated that he 'remember[ed] the day when the presence of a detainer automatically guaranteed that the inmate would be held in close custody and denied training and work experiences in more relaxed situations, such as the farm, which frequently represent a valuable resource in treating prisoners and testing their progress.' The Council of State Governments also pointed out that the existence of detainers presented problems in sentencing; when detainers had previously been filed against the defendant, the sentencing judge would hesitate to give as long a sentence as he thought might otherwise be indicated, there being a possibility that the defendant would be required to serve subsequent sentences. The Council stated that 'proper sentencing, as well as proper correctional treatment, is not possible until the detainer system is modified.' Similar concerns were expressed by the Attorney General in his recommendation to Congress.
>
> *The adverse effects of detainers that prompted the drafting and enactment of the Agreement are thus for the most part the consequence of the lengthy duration of detainers.* Because a detainer remains lodged against a prisoner without any action being taken on it, he is denied certain privileges within the prison, and rehabilitation efforts may be frustrated.
>
> .   .   .

*United States v. Mauro,* 436 U.S. 340, 359, 98 S.Ct. 1834, 1846, 56 L.Ed.2d 329 (1978) (citations omitted); *see United States v. Ford,* 550 F.2d 732, 737–41 (2d Cir. 1977), *aff'd sub nom. United States v. Mauro,* 436 U.S. at 340, 98 S.Ct. 1834.[13]

Rather than suffering the effects of detainers of "lengthy duration," the pretrial detainee and similarly the parole violator, by the very nature of their custody which is necessarily limited, are subject only to detainers of minimal duration. Hence detainers lodged against a pretrial detainee or a parole violator, by definition incapable of "lengthy duration," cannot affect a prisoner

---

**13.** The drafters of the Act also discussed at length the adverse effect of detainers on the defense and rehabilitation of prisoners.

> The Attorney General has advised the [Senate] committee that a prisoner who has had a detainer lodged against him is seriously disadvantaged by such action. He is in custody and therefore in no position to seek witnesses or to preserve his defense. He must often be kept in close custody and is ineligible for desirable work assignments. What is more, when detainers are filed against a prisoner he sometimes loses interest in institutional opportunities because he must serve his sentence without knowing what additional sentences may lie before him, or when, if ever, he will be in a position to employ the education and skills he may be developing. Although a majority of detainers filed by States are withdrawn near the conclusion of the Federal sentence, the damage to the rehabilitation program has been done because the institution staff has not had sufficient time to develop a sound pre-release program.

S.Rep. No. 1356, *supra, reprinted in* [1970] U.S. Code Cong. & Admin.News at p. 4866; *see United States v. Ford,* 530 F.2d at 737–41 (scholarly and detailed documentation of the disadvantages and abuses of the pre-Act detainer system).

who merely awaits a trial or a parole revocation hearing in the same manner that a detainer would affect the prisoner who is serving a term of imprisonment.

Further, just as the trial of a pretrial detainee must, under the Constitution [14] and by statute,[15] be held within determinable time periods,[16] so too must a parole revocation hearing "be tendered within a reasonable time after a parolee is taken into custody." *Morrissey v. Brewer,* 408 U.S. 471, 488, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972). Indeed, parole violation custody, determined by the boundaries of due process, may be required to conclude even earlier than pretrial custody. *Compare Morrissey v. Brewer,* 408 U.S. at 488, 92 S.Ct. at 2604 ("two months . . . would not appear to be unreasonable") *with* U.S.Const. Amend. VI *and* Speedy Trial Act of 1974.[17]

## C.

With these precepts in mind, we turn to the particular circumstances of Dobson's case. Dobson as a putative parole violator was entitled to a prompt parole revocation hearing. *Morrissey v. Brewer,* 408 U.S. at 488, 92 S.Ct. 2593. That hearing would determine whether Dobson had violated the terms and conditions of his parole. Pa.Stat. Ann. tit. 61, § 331.21a(b) (Purdon 1964). If Dobson had violated his parole, he could have been "recommitted" and "reentered to serve the remainder of his original sentence." *Id.* However we know that not every violation of parole automatically or necessarily results in revocation. As the Supreme Court has stated:

> Typically, a parole [violator] will be counseled to abide by the conditions of parole, and the parole officer ordinarily does not take steps to have parole revoked unless he thinks that the violations are serious

and continuing so as to indicate that the parolee is not adjusting properly and cannot be counted on to avoid antisocial activity.

*Morrissey v. Brewer,* 408 U.S. at 479, 92 S.Ct. at 2599 (footnote omitted). In short, we recognize the nature of, and the uncertain consequences that flow from, parole violation custody. We therefore conclude that it would be anomalous to apply a statute which was enacted "to permit the prisoner to secure a greater degree of certainty as to his future"[18] to a parole violator whose prehearing custody, being uncertain and temporary, has no relation to the purposes which the Act seeks to promote.

This conclusion is borne out here, and reinforces the disposition which we have reached in respect to Dobson's claim. The record reveals that Dobson, although scheduled for a parole revocation hearing, did not have such a hearing but was rather summarily released from the custody in which he was being held, and was continued on parole.

## III.

■ To conclude, we hold that the Act neither by its terms nor by the purposes which it was designed to achieve can be said to apply to a parole violation detainee prior to a determination by the parole board that parole has been violated and that the detainee is to be recommitted and reentered to serve the balance of his sentence from which he had once been paroled. *See* Pa. Stat.Ann. tit. 61, § 331.21a(b) (Purdon 1964).

The order of the district court dismissing Dobson's federal indictment will be reversed, and the case will be remanded for proceedings consistent herewith.

---

**14.** U.S.Const. amend. VI.

**15.** Speedy Trial Act of 1974, 18 U.S.C. §§ 3161 *et seq.*

**16.** Under the provisions of the Speedy Trial Act of 1974, and during the preliminary stages of its implementation, a pretrial detainee could have remained in custody after an arraignment for as long as 180 days, which period was then

reduced in successive years to 120 days, and then to 80 days, and ultimately to 60 days. 18 U.S.C. §§ 3161(g), 3163(b).

**17.** *See* 18 U.S.C. §§ 3161(g), 3163(b), *discussed in* n.16 *supra.*

**18.** S.Rep. No. 1356, *supra, reprinted in* [1970] U.S.Code Cong. & Admin.News at p. 4865.