**UNITED STATES of America**

v.

**Tyrone B. HUTCHINS.**

**No. H CR 79–21.**

United States District Court,
N. D. Indiana,
Hammond Division.

April 28, 1980.

ORDER

McNAGNY, District Judge.

This matter is before the Court on defendant's November 13, 1979 *pro se* motion to dismiss the indictment. The motion asserts generally that the Government failed to act promptly on the defendant's May 11, 1979 request for a speedy trial. The mention of a 180-day period clearly invokes the defendant's rights under the Interstate Agreement on Detainers Act ("the Agreement"), 18 U.S.C. App. §§ 1–8.[1] The Court also interprets the motion to dismiss as asserting the defendant's rights under the Sixth Amendment to the Constitution and the Speedy Trial Act of 1974, 18 U.S.C. §§ 3161–3174. However, because of the decision herein the Sixth Amendment and Speedy Trial Act issues need not be addressed.

■ The motion is obviously brought pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure. Under that Rule and Rule 12(e) the Court should generally decide motions of this nature prior to trial as long as such a determination would not be tantamount to a trial of the general issue. *See United States v. Covington*, 395 U.S. 57, 60, 89 S.Ct. 1559, 1561, 23 L.Ed.2d 94 (1969). Here, the motion is based on factual and legal issues entirely distinct from those imbedded in the general issue. Therefore, the Court will proceed to make a pretrial determination.

■ Rule 12(e) also provides that where factual issues are involved in ruling on a 12(b) motion the Court must make essential findings of fact on the record. The Court need not hold a hearing on the factual issues presented by the instant motion, but may instead rely on pleadings, exhibits and affidavits in the record as the evidentiary basis for its findings. *United States v. Cohen*, 489 F.2d 945, 952 (2nd Cir. 1973).

Richard A. Hanning, Asst. U. S. Atty., Hammond, Ind., for plaintiff.

James J. Nagy, Eichhorn, Eichhorn & Link, Hammond, Ind., for defendant.

1. Citations to the Agreement will be to pertinent Articles and subparts of Articles, e. g. "Article III(a)." All the substantive portions of the Agreement appear as Articles, which are codified under 18 U.S.C. App. § 2.

## The Facts

The facts essential to defendant's motion are not really in dispute. Based on the uncontested exhibits and affidavits in the record, the Court makes the following findings of fact.

On January 1, 1979 an information was filed in Nevada state court charging defendant Tyrone B. Hutchins with grand larceny. Thereafter the defendant was taken into custody, arraigned, and kept in custody until February 26, 1979 when he entered a plea of guilty to attempted grand larceny and was released on his own recognizance. Because the defendant failed to appear for a parole and probation interview a bench warrant for his arrest issued on April 5, 1979. In late April 1979 the defendant was arrested by officers of the East Chicago, Indiana Police Department for a traffic offense. Formal charges on this offense were not brought and within three days the defendant was released. Shortly thereafter, however, the defendant was re-arrested by the East Chicago Police on the outstanding Nevada bench warrant. The record is unclear as to the defendant's custodial status and location from the time of his re-arrest until May 11, 1979, but on May 11th he was in the custody of the Las Vegas (Nevada) Metro Police Department.

On May 10, 1979 a complaint charging the defendant with bank robbery was sworn out in the Northern District of Indiana by a Special Agent of the Federal Bureau of Investigation. The same day an arrest warrant issued on this charge. The warrant was received on May 17, 1979 by the United States Marshal in Las Vegas, Nevada. On May 11, 1979, however, a detainer based on the May 10th warrant had been lodged against the defendant.

The detainer was completed on a standard Form USM–16 and was signed by the Chief Deputy United States Marshal in Las Vegas. It was addressed to the Las Vegas Metro Police Department, attention of the Jail Commander, and was received by the addressee on May 11, 1979. The same day a Deputy United States Marshal advised the defendant of the basis of the detainer and the defendant's right to demand a speedy trial under the Speedy Trial Act of 1974. At that time the defendant completed the Form USM–17 attached to the detainer, thereby making a written demand for a speedy trial of the relevant charges. The Deputy Marshal witnessed the defendant's acknowledgement of the detainer and demand for a speedy trial.

A receipted copy of the detainer and the defendant's attached demand for a speedy trial were received by the United States Attorney in the Northern District of Indiana on May 16, 1979. This Court did not receive notice of defendant's status and his demand until November 9, 1979. The record is silent as to any subsequent notice to the defendant of the detainer, or opportunity to request final disposition of the charges underlying it.

On May 21, 1979 the defendant was brought before the Nevada court which adjudged him guilty on the attempted grand larceny charge and ordered him held in jail until his sentencing. Then on June 25, 1979 the Nevada court entered its judgment of conviction as to the defendant, also sentencing him to four years imprisonment with 151 days credit for time served.

Back in the Northern District of Indiana, on August 23, 1979 an indictment was returned against the defendant based on the same facts and charges underlying the May 10th complaint. A warrant based on this indictment was issued the same day. No further action was taken on the indictment and warrant until December 17, 1979 when the Government petitioned for a writ of habeas corpus ad prosequendum. The petition called for arraignment of the defendant on January 9, 1980.

## The Law

Both the Government and the State of Nevada are party "States" subject to the Agreement. 18 U.S.C. App. §§ 1–8; Nev. Rev.Stat. §§ 178.620–.640.

In its November 21, 1979 response to defendant's motion to dismiss, and its December 4, 1979 supplement to that response, the

Government initially asserts that the Agreement "is limited to persons who have 'entered upon a term of imprisonment in a penal or correctional institution of a party State.'" The Government then argues (1) that the motion to dismiss should be denied because the defendant has not met his burden of showing that he was serving such a term of imprisonment when he made his demand for a speedy trial, or (2) that the defendant's demand for a speedy trial was ineffective because it was made before he was sentenced, and thus before he had entered upon a term of imprisonment. These arguments are unpersuasive.

According to Article III(a) of the Agreement, the requirement that a defendant be brought to trial on certain charges within 180 days is triggered when the following four factors are present: (1) the defendant has entered upon a term of imprisonment in a penal or correctional institution of a party State, (2) during the continuance of that term of imprisonment the charges in question are pending against the defendant in another party State, (3) a detainer based on such charges has been lodged against the defendant, and (4) the defendant has caused written notice and request for final disposition of the charges to be delivered to the appropriate prosecuting authorities and court.

Although Article III(a) mentions the above four factors in the order listed here, there is no explicit requirement that they accrue in any special sequence. It is obvious, however, that the charges pending in the foreign jurisdiction must exist before a detainer based on them can be lodged. In addition, the basic structure of the pertinent sentence in Article III(a) suggests that the defendant should actually be serving a term of imprisonment at the time he causes his notice and request to be delivered to the appropriate entities. At least that is a natural reading of the sentence.

The legislative history of the Agreement as adopted by Congress also supports this interpretation. Both House and Senate Reports define a detainer as "a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction." S.Rep. No. 1356, 91st Cong., 2d Sess. 2 (1970), H.R.Rep. No. 1018, 91st Cong., 2d Sess. 2 (1970), U.S.Code Cong. & Admin.News 1970, pp. 4864, 4865. Despite these intimations that there is a required or appropriate timing to procedure under the Agreement, this Court is of the opinion that in order to preserve the effectiveness of the Agreement as an attempt to address certain problems, it is necessary to call the Agreement into play even when the requisite events do not occur in the ideal sequence.

Ideally, the Agreement is to be applied when a prisoner is incarcerated pursuant to sentence. While he is so incarcerated a detainer based on pending charges is lodged against him. Notice of the detainer and of the prisoner's rights is given, and the prisoner has the opportunity to exercise his rights under Article III to request final disposition of the pending charges. All this takes place while the prisoner is in custody pursuant to sentence, thus giving the prisoner a chance to avoid the negative effects of a detainer hanging over him for the duration of his sentence. These negative effects include "uncertainties which obstruct programs of prisoner treatment and rehabilitation." Article I.

The legislative history of the bill enacting the Agreement further explicates the problems giving rise to the Agreement:

### NEED FOR THE LEGISLATION

The Attorney General has advised the committee that a prisoner who has had a detainer lodged against him is seriously disadvantaged by such action. He is in custody and therefore in no position to seek witnesses or to preserve his defense. He must often be kept in close custody and is ineligible for desirable work assignments. What is more, when detainers are filed against a prisoner he sometimes loses interest in institutional opportunities because he must serve his sentence without knowing what additional sentences may lie before him, or when, if

ever, he will be in a position to employ the education and skills he may be developing. Although a majority of detainers filed by States are withdrawn near the conclusion of the Federal sentence, the damage to the rehabilitation program has been done because the institution staff has not had sufficient time to develop a sound pre-release program.

S.Rep. No. 1356, 91st Cong., 2d Sess. 3 (1970), H.R.Rep. No. 1018, 91st Cong., 2d Sess. 3 (1970), U.S.Code Cong. & Admin. News 1970, pp. 4864, 4866. *See also United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978) (at pages 349–53, 98 S.Ct. at pages 1841–1843 discussing the purposes of the Agreement, and at page 361, 98 S.Ct. at page 1847 holding in part that a writ of habeas corpus ad prosequendum was not a "detainer" subject to the Agreement because with such a writ "the problems that the Agreement seeks to eliminate do not arise"—the writ being merely a means of securing the prisoner's presence for immediate disposition of pending charges, thus leading to a rapid settlement of any uncertainties regarding those charges).

Here it can be argued that because the detainer in question was lodged several weeks prior to defendant Hutchins' sentencing on June 25, 1979, "the problems that the Agreement seeks to eliminate to not arise," *Mauro, supra*, 436 U.S. at 361, 98 S.Ct. at 1847. However, the detainer was certainly effective prior to the sentencing, and it was not withdrawn or voided upon the sentencing. Although the record does not show affirmatively that Nevada prison authorities considered the original detainer lodged with the Las Vegas Police to have carried over with the defendant in his new status as a prisoner of the state correctional authorities, this would normally be the case. Otherwise a detainer would only be effec-

tive so long as the target prisoner did not change hands among different custodial agencies. In addition, in the November 9, 1979 letter to the Court on behalf of the defendant, it is asserted that the detainer lodged against the defendant "may have an adverse effect on Mr. Hutchins [sic] chances for a parole." The Government never contests this assertion or otherwise claims that the detainer became ineffective when the defendant was sentenced. Clearly, as soon as the defendant became a prisoner serving a sentence, the precise problems sought to be addressed by the Agreement did begin to arise. Therefore, at least as of the time the defendant was sentenced, the detainer here was subject to the Agreement.

The remaining question of timing involves the request by the defendant for speedy disposition of the charges underlying the detainer. Article III(c) provides that the official having custody of a prisoner "shall promptly inform him of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition of the [charges] on which the detainer is based." As discussed earlier, the Agreement contemplates that ideally the prisoner involved will be serving a sentence when his custodian notifies him of a detainer and his rights under the Agreement. The timing thus contemplated, however, is not essential and should not be strictly required in a technical fashion when to do so would undercut the purposes of the Agreement. The Agreement is to be "liberally construed so as to effectuate its purposes." Article IX.

Here, the Government's argument boils down to this: Because the United States Marshals Office that prepared and served the detainer mistakenly and unnecessarily[2]

---

2. The detainer was drawn up by the United States Marshal in Las Vegas and was served on the Las Vegas Metro Police Department. It contains information as to the custodian's obligations and the prisoner's rights under the Speedy Trial Act of 1974, 18 U.S.C. §§ 3161–3174. There is no mention on the detainer of the Agreement or any rights or obligations thereunder. The information set forth on the

detainer contains the statement, addressed to the custodian, that "the notice requirement provisions [of the Speedy Trial Act] would not apply to Detainers lodged against prisoners who have not yet been sentenced at the time the Detainer is lodged." Yet a box was checked by the Marshal indicating that the notice requirements of the Speedy Trial Act did apply and that the custodian was to give a copy

caused the defendant to be informed, before he had entered upon a term of imprisonment, of his rights to demand speedy disposition of the charges underlying the detainer, the pre-sentence demand so made was ineffective and a nullity. In the context of this case, a corollary to the Government's argument is that the rights of a sentenced prisoner under the Agreement can be successfully torpedoed when prison authorities having custody of the prisoner neglect to fulfill their duties under Article III(c) to provide notice and opportunity.[3]

█ But Congress could not have intended that prisoners' rights under the Agreement would be so easily jettisoned. Certainly on the facts of this case, where a prisoner is led to believe that he has made an effective demand for final disposition of pending charges, the absence of a second demand made after sentencing, when no second notice and opportunity were presented to the prisoner by custodial authorities, cannot be held against the prisoner.

█ Therefore, just as the detainer itself remained effective after the defendant's sentencing, becoming subject to the Agreement, so also could the defendant's demand for speedy disposition of the charges against him be effective as of his sentencing.[4] To hold otherwise would be to fly in the face of the clearly intended function of the Agreement, and would unjustly allow the Government to subvert the Agreement by oversight or by design.

Because of this holding, if the defendant fulfilled his own obligations under the

Agreement, he should have been brought to trial by December 22, 1979, 180 days from the day of his sentencing. Article III(a). The Government was given notice on November 13, 1979 of potential problems with a delay in bringing the defendant to trial. Yet the Government did not petition for a writ of habeas corpus ad prosequendum to secure the presence of defendant until December 17, 1979. In that petition the Government indicated its intent to arraign the defendant on January 9, 1980. Thus December 22, 1979 passed without even an arraignment, much less a trial.[5]

The facts and holding here appear to make the defendant's motion to dismiss premature when originally filed on November 13, 1979 in the form of a letter. However, this is irrelevant to the merits of the motion, which matured on December 23, 1979. Therefore pursuant to Article V(c) of the Agreement, the complaint and superceding indictment in this case are subject to dismissal as long as the defendant performed all the acts required to trigger the 180-day provision of Article III(a). It is to this issue that the Court now turns.

The Government's second major argument is that the defendant never "caused to be delivered to the prosecuting officer *and the appropriate court . . .* written notice of the place of his imprisonment and his request for a final disposition" of the charges underlying the indictment. *See* Article III(a) (emphasis added). The Government correctly notes that although it received the defendant's request for a

---

of the detainer to the defendant and complete a Form USM–17, on which the defendant was to be given the opportunity to demand a speedy trial on the charges underlying the detainer. Thus, notice and opportunity to request final disposition on the charges were actually given to the defendant even though it was not necessary until after the defendant had been sentenced.

3. There is no indication in the record that defendant Hutchins was ever re-notified, after he was sentenced, as to the detainer and his rights under the Agreement. If the original pre-sentence notification and demand were void, as the Government contends, the derogation of Article III(c) obligations by the defendant's cus-

todians seems to be without remedy, no specific remedy being provided in the Agreement. *But see* n. 8, *infra.*

4. This Court is of the opinion that the defendant was not yet imprisoned pursuant to sentence on May 11, 1979 despite the Nevada court's grant of credit for that day and many others as time served.

5. In its November 21, 1979 memorandum the Government admits that delay up to that point was an "administrative oversight" without legal justification. It appears that delay after that point can be described in more disparaging terms.

speedy trial on May 16, 1979, the Court received no prompt notice or request. Thus, it is claimed, the defendant's rights under the Agreement have not accrued. This argument not only runs counter to the intent of the Agreement and its liberal construction, but also ignores the clear language of Article III(b) and (d).

■ It is clear from Article III(b) that a prisoner, having been notified of a detainer lodged against him, need only give his local custodian written notice of the place of his incarceration and written request for final disposition of the charges underlying the detainer.[6] It is then incumbent upon the custodian to attach a certificate described in Article III(a) and to forward all these papers to the appropriate prosecuting authorities and court. Article III(d) contains similar duties where more than one indictment or information is involved. Contrary to the Government's argument, therefore, the intended procedure under the Agreement does not require the prisoner to cause actual delivery of his notice and request to the appropriate prosecutor and court.

An additional point, not raised by the Government, should also be addressed in the context of this argument. The record here shows that a Deputy United States Marshal, rather than the defendant's actual custodian, provided the defendant with the notice and opportunity called for by Article III(c). As discussed above, the fact that such notice and opportunity were premature does not deprive the defendant of his rights under the Agreement. However, it can be argued that because the Marshal's Service did not actually have custody of the defendant, the notice and opportunity afforded were not effective under the Agreement.

More importantly, Article III(b) literally provides that the notice and request re-quired of the defendant in order to trigger his rights under the Agreement "shall be given or sent by the prisoner to the warden, commissioner of corrections, or other official having custody of him." Thus there is a question whether defendant's notice and request could be effective when given to a Deputy Marshal who did not have legal custody of him.

The effectiveness of the Deputy Marshal's notice and opportunity is not of great concern here. Article III(a) sets forth the four circumstances that together trigger the 180-day prescription underlying the instant motion. Technical compliance with the notice and opportunity provisions of Article III(c) is not among them. It would be inappropriate indeed if derogation of Article III(c) by custodial authorities could bar a defendant's rights under the Agreement when the defendant is given notice and opportunity by a non-custodial entity. However, the effectiveness of the defendant's notice and request, made to non-custodial authorities, is a different issue.

■ When the Agreement requires a custodian to provide notice and opportunity, it is entirely appropriate that the Agreement should then call for delivery of the prisoner's notice and request to that same custodian. In light of this it would be asking entirely too much to require a prisoner, incorrectly notified of his rights by the wrong person at the wrong time, yet seeking to assert his rights in the manner expressly provided by that person, to know that his actions do not fit the letter of the statute under which he asserts his rights.

Here, it would be unconscionable to hold that defendant Hutchins' rights under the Agreement never accrued because the notice and request he reasonably believed to be effective [7] were given to the wrong person, that same person having incorrectly

---

**6.** The Government does not contend that the substance of what the defendant gave the Deputy Marshal was not a suitable written notice and request as called for in Article III(a). In fact, by filling out and giving to the Marshal the Form USM–17 *attached to* the detainer itself, which contained written information as to the place of the defendant's incarceration, the de-fendant did submit adequate written notice and request.

**7.** This belief is evidenced by the defendant's November 13, 1979 motion. Its reasonableness can be inferred from the circumstances under which he was notified of the detainer and made his request for a speedy trial.

assumed the notice and opportunity obligations of the defendant's custodian. Such a holding would invite either knowing or inadvertent abuse of prisoners' rights.

It is the opinion of this Court that because the Deputy United States Marshal stepped into the Las Vegas Jail Commander's shoes by undertaking the Article III(c) duty to provide notice and opportunity to the defendant, the Deputy Marshal also stepped into the Jail Commander's shoes for purposes of accepting the defendant's notice and request under Article III(b). The Government should not be heard to claim that the mistakes of its agents so easily void a defendant's statutory rights.[8]

The Court holds that the defendant fulfilled all of his obligations under the Agreement and, the other requirements of Article III(a) being met, his trial should have begun by December 22, 1979. Because it did not, the Court now ORDERS that the defendant's motion to dismiss the indictment be GRANTED, and that the indictment and all charges on which it was based be, and hereby are, DISMISSED with prejudice.

---

**8.** The Court notes that if the Government had successfully argued that the defendant's notice and request were ineffective because they were premature, or because the Deputy Marshal accepting them did not literally have custody of the defendant, the Court would have held that the utter failure of the defendant's actual custodian to fulfill its Article III(c) duties would justify a dismissal of the charges here.

Although no such remedy is expressly provided in the Agreement, Article III(c) nonfeasance on a custodian's part could be grounds for dismissal of charges. If a custodian fulfills its duties under Article III(c) a prisoner receives notice and opportunity and can submit his written notice and request to the custodian. However, if Article III(b) is ignored by the custodian, the notice and request will never reach the appropriate prosecutor and court. After 180 days the pending charges would be of no effect. Thus, under the Agreement, the authorities of party States are dependent upon one another, and the mistakes of one can be held against another. The Court sees no reason why *complete* nonfeasance under the Agreement should go unremedied when *partial* nonfeasance would not.