COMMONWEALTH *vs*. RALPH J. PETROZZIELLO.

Suffolk. March 10, 1986. — April 15, 1986.

Present: GREANEY, C.J., KAPLAN, & DREBEN, JJ.

*Interstate Agreement on Detainers. Practice, Criminal,* Defendant in custody of another jurisdiction, Detainer. *Words,* "Term of imprisonment."

A prisoner in Federal custody awaiting parole revocation proceedings who was brought into the Commonwealth pursuant to a detainer lodged against him on August 9, 1983, by the district attorney for the Suffolk District in accordance with the Interstate Agreement on Detainers; whose parole was revoked by Federal authorities on March 13, 1984; and who, after having been transferred to the temporary custody of the district attorney for the Berkshire District and tried from March 19, 1984, through April 6, 1984, on a separate indictment, was acquitted and, by mistake, returned to Federal custody without any disposition being made of the Suffolk indictments, was not entitled thereby to dismissal of those indictments under art. III (*a*) and (*d*) of the agreement on the ground that the 180 day time limitation for bringing him to trial had been exceeded where, since the relevant time period commenced on March 13, 1984, the date when his parole was revoked and he "entered upon a term of imprisonment," and since the period was tolled during the Berkshire trial, only 40 days had elapsed at the time he filed his motion to dismiss the Suffolk indictments on May 10, 1984. [78-80]

A prisoner in Federal custody awaiting parole revocation proceedings who was brought into the Commonwealth pursuant to a detainer lodged against him by the district attorney for the Suffolk District in accordance with the Interstate Agreement on Detainers, and who, after being transferred to the temporary custody of the district attorney for the Berkshire District for trial on a separate indictment, was acquitted and, by mistake, returned to Federal custody without any disposition having been made of the Suffolk indictments for first degree murder and armed robbery, was not entitled thereby to dismissal of those indictments under arts. III (*d*), IV (*e*) and V (*c*) of the agreement on the ground that he was returned to Federal custody before the charges underlying the Suffolk County detainer had been tried, where evidence in the record indicated that the district attorneys in question had intended to comply with the terms of the agreement, that the prisoner's return to Federal custody was the result of a mistake, that the prisoner's rehabilitation had not been

adversely affected, and that the purposes of the agreement had not been violated. [80-82]

INDICTMENTS found and returned in the Superior Court Department on October 11, 1979.

A motion to dismiss was heard by *Rudolph F. Pierce, J.*, and questions of law were reported by him to the Appeals Court.

*Harry L. Manion, III (John B. Kinsellagh* with him) for the defendant.

*Judy G. Zeprun,* Assistant District Attorney (*Charles M. Campo, Jr.,* Special Assistant District Attorney, with her) for the Commonwealth.

GREANEY, C.J. The defendant moved in the Superior Court to dismiss indictments charging him with murder in the first degree and armed robbery. He maintains that dismissal was required because the Commonwealth had violated the Interstate Agreement on Detainers (Agreement), to which both the Commonwealth (St. 1965, c. 892, § 1) and the United States (Pub. L. No. 91-538, 84 Stat. 1397 [1970]) are parties. After an evidentiary hearing, a judge of the Superior Court denied the motion and reported the question of the correctness of his ruling to this court.[1] See Mass.R.Crim.P. 34, 378 Mass. 905 (1979).

The facts were established by the judge after an evidentiary hearing and may be summarized as follows. On May 24, 1974, a Boston police officer was shot and killed during an armed robbery of a supermarket. On October 10, 1979, the defendant was charged in two indictments with the armed robbery and the first degree murder of the officer. On December 5, 1979, the district attorney for the Suffolk District obtained a Federal flight warrant against the defendant. This warrant was delivered to the Federal Bureau of Investigation together with the original Suffolk warrant for the defendant's arrest. On August 5, 1983,

---

[1] The report was intended to avert a lengthy trial in the event the ruling on the motion was found to be incorrect. The report poses four questions concerning the applicability of the Agreement. We do not think it necessary to labor over them and will instead consider the correctness of the judge's ruling in light of the facts and the requirements of the Agreement.

the defendant was taken into Federal custody pursuant to the flight warrrant and a Federal parole violation warrant issued in 1979.[2] On August 9, 1983, the Suffolk district attorney sent a detainer to the Federal correctional institution in Milan, Michigan, where the defendant was incarcerated pending disposition of the parole revocation proceedings.

The defendant was thereafter moved, on September 22, 1983, from Milan to the Federal correction institution in Danbury, Connecticut, and moved again, on September 25, 1983, from Danbury to the State prison in New Hampshire, where he was held as a Federal prisoner. Parole violation hearings scheduled for November 8, 1983, and January 11, 1984, were continued at Petrozziello's request.

On December 2, 1983, counsel for the defendant requested by letter that the Suffolk district attorney's office arraign and try him as soon as possible on the robbery and murder charges. On December 7, 1983, the defendant requested that the United States Marshal provide him with copies of all detainers lodged against him. He was told, on December 12th, that at his parole revocation hearing he would be advised of "who has what on you." On January 10, 1984, the district attorney for the Berkshire District formally requested temporary custody of the defendant, pursuant to art. IV of the Agreement, in order to try him on an indictment for armed robbery while masked. The defendant was informed of the Berkshire detainer, and on January 17, 1984, requested, pursuant to art. III of the Agreement, the disposition of all charges against him.

On January 24, 1984, the defendant was transferred to the custody of Berkshire County. Upon taking custody, the district attorney there notified all Commonwealth district attorneys that under the Agreement the defendant had to be tried on all State charges before being returned to Federal custody. On January 26, 1984, he was arraigned in the Superior Court in Berkshire County on the armed robbery while masked charge

---

[2] At the time, the defendant was allegedly in violation of his parole from a Federal sentence he was serving at the Federal correctional institution in Lewisburg, Pennsylvania.

pending in that county and arraigned on January 30, 1984, in the Superior Court in Suffolk County on the armed robbery and murder charges pending here. On March 13, 1984, the United States Parole Board revoked the defendant's parole. From March 19, 1984, through April 6, 1984, he was tried before a jury in Berkshire County and acquitted of the armed robbery while masked offense. The defendant was then returned to Federal custody on April 9th or 10th as a result of a mistake on the part of the district attorney's office in Berkshire. The circumstances of that transfer are more fully described in the judge's findings as follows:

> "I find that the return of Petrozziello to Federal custody on April 9 or 10 resulted from negligence by the district attorney's office in Berkshire County.
>
> "This finding is based on the following. From the evidence presented, I conclude that Petrozziello's acquittal was both a surprise and a substantial disappointment to the district attorney's office in Berkshire County. A temporary paralysis apparently prevailed in the district attorney's office after the jury's verdict was returned. Such an atmosphere no doubt accounts for the following developments.
>
> "Major John Shaughnessy, the director of security at the Berkshire house of correction, called first assistant district attorney Daniel Ford on the afternoon of April 6. The jury was deliberating at the time of the call. Mr. Ford, the prosecutor of the Berkshire action against Petrozziello, was out of his office. Shaughnessy left a message indicating that Ford should work out the problems concerning Petrozziello's transportation with the United States Marshal's Office. This message was not received by Mr. Ford until after he learned of the jury's disheartening (from his point of view) verdict. He then turned the message over to State trooper Richard Smith and told him to take care of it. Trooper Smith was assigned to the district attorney's office. Smith then made a series of telephone calls regarding Mr. Petrozziello's transporta-

tion to Boston. His first call was to Bernard Stone in the United States Marshal's Office. Thereafter he made and received calls from the Berkshire County house of correction. Finally, trooper Smith learned that Berkshire County correction officials either could not or would not transport Petrozziello to Boston, so he made arrangements with Bernard Stone to turn Petrozziello over to Deputy United States Marshals at the Federal courthouse in Springfield the following Monday. That evening, April 6, trooper Smith fully apprised Mr. Ford of these arrangements. During his testimony, Mr. Ford admitted that he had been so advised; however, he thought at the time, so he testified, that the United States Marshals were going to transport Mr. Petrozziello back to Boston to the Suffolk County district attorney. Instead, they transported Petrozziello to Danbury, from which he was thereafter transferred to Lewisburg."

The district attorney in Suffolk was not notified of the defendant's transfer at any time between April 6th and 10th, but first learned of the defendant's return to Federal custody on April 12, 1984. On May 10, 1984, the defendant's counsel filed this motion to dismiss the Suffolk indictments on the ground the the Agreement had been violated.

The defendant alleges two violations of the Agreement that he contends require dismissal of the Suffolk County indictments for murder and robbery. First, he maintains that the indictments must be dismissed because pursuant to subsections (*a*) and (*d*) of art. III of the Agreement the Suffolk district attorney's office failed to try him within 180 days of the lodging of a detainer against him by that office on August 9, 1983. Second, he maintains that arts. III(*d*), IV(*e*) and V(*c*) require dismissal because he was returned to Federal custody before the charges underlying the Suffolk County detainer were tried.[3]

---

[3] The defendant also argues that the Commonwealth should be estopped from asserting the inapplicability of the Agreement. We need not consider this argument because we conclude that the Agreement applies to this case.

Before discussing these contentions, we think it useful to summarize the background of the Agreement and the manner in which it operates.

The Agreement provides a prisoner with an orderly method for the final resolution of pending detainers[4] and furnishes prosecutors with a uniform procedure by which they can obtain temporary custody of a prisoner for purposes of trial. In so doing, the Agreement sought to redress certain abuses involving detainers. Before the Agreement's enactment, it was commonplace to see detainers routinely filed, often with little basis in fact, which worked to the prisoner's prejudice. See *Carchman* v. *Nash,* 473 U.S. 716, 729-730 (1985). In many cases, the prisoner's custodians would consider the pending charges underlying the detainers as proof of criminal proclivity adversely affecting the prisoner's eligibility for work assignments, other rehabilitation opportunities, and parole. *Id.* at 729-733. See also *United States* v. *Scheer,* 729 F.2d 164, 166-167 (2d Cir. 1984). It was not infrequent to see a continual cycle of prosecution, a return to imprisonment, and prosecution without any rehabilitation in between. It was also not unusual for pending detainers to be withdrawn shortly before the prisoner was released. *Carchman* v. *Nash, supra* at 729-730. This generally unregulated system frustrated both prisoner and prosecutor. To alleviate these problems the Agreement was adopted to "encourage the expeditious and orderly disposition of [pending] charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints." *United States* v. *Scheer, supra* at 167, quoting from art. I of the Agreement.

The provisions of art. III and IV form the core of the Agreement. Article III focuses on the prisoner. Article III(*a*) provides that a prisoner who "has entered upon a term of imprisonment" can request the speedy disposition of the charges giving rise

---

[4] The Agreement contains no definition of the term "detainer," but the Senate Report recommending its enactment defines a "detainer" as "a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction."

to a detainer. If the prisoner makes such a request, the jurisdiction that filed the detainer must bring him to trial within 180 days. For good cause, however, a court may grant necessary or reasonable continuances which extend this time. Article III(*c*) requires that the prisoner's custodian shall promptly inform him of detainers lodged against him and of is right to make a request for final disposition of the underlying charges. Article III(*d*) states that any request for final disposition operates as a request for final disposition of all untried indictments underlying all detainers that have been lodged by the particular State. This subsection also prescribes a penalty of dismissal with prejudice if the prisoner is returned to his original place of confinement without having been tried on the charges. Under art. III(*e*), the prisoner's request for final disposition constitutes a waiver of extradition.

Article IV addresses the prosecutor's ability to obtain temporary custody of a prisoner who has entered upon a term of imprisonment and places two limitations on that authority. Article IV(*c*) provides that the prisoner is to be tried within 120 days of his arrival in the State, but, like art. III, permits necessary or reasonable continuances to extend that time. Article IV(*e*) also requires dismissal of the indictment with prejudice if it is not tried prior to the prisoner's being returned to his original place of imprisonment.[5]

1. With this background in mind, we turn to the defendant's specific contentions. The essence of his first argument is that, because more than 180 days elapsed betweeen the lodging of the detainer by the Suffolk district attorney's office on August 9, 1983, and the May 10, 1984, filing of his motion to dismiss, the time limitations imposed by the Agreement have been exceeded and the Suffolk indictments must be dismissed with prejudice.

The most obvious difficulty with this contention lies in the defendant's status between August 9, 1983, and March 13, 1984. During that period, he was held as a putative parole violator and not as a prisoner serving a sentence. Both arts.

---

[5] The requirement of dismissal in arts. III and IV is repeated in art. V(*c*).

III and IV of the Agreement expressly permit only a prisoner who "has entered upon a term of imprisonment" to request the final disposition of pending charges. It is the prevailing law that an individual who is awaiting a determination whether he has violated his parole is not yet serving a "term of imprisonment" within the meaning of that language in the Agreement. *United States* v. *Dobson,* 585 F.2d 55, 58-61 (3d Cir. 1978).[6] The defendant did not again enter upon a term of imprisonment until March 13, 1984, when his parole was revoked and he resumed serving his Federal sentence.

The question, therefore, becomes which of several dates should be chosen as the date for the commencement of the limitations periods set forth in the Agreement.[7] The defendant contends

[6] The court in *Dobson* (at 58-59), explained the situation as follows:

"It seems clear to us that the natural meaning of the phrase 'serving a term of imprisonment' denotes no more or less than that definable period of time during which a prisoner must be confined in order to complete or satisfy the *prison term or sentence* which has been ordered. Thus, the very words of the statute would appear to exclude those held in custody for periods of time which are not defined in terms of duration, which are not certain, and which do not follow a conviction or determination of parole revocation. Hence even though we recognize that the basis for a parolee's detention is the underlying sentence from which he has been paroled, until such time that the parole violator is recommitted after a hearing, and his incarceration thereby made certain and fixed as to duration, no term of imprisonment can be said to have commenced or resumed. In this respect a parole violator is no different than a pretrial detainee who is merely awaiting trial and who, until conviction and sentencing, cannot commence service of a term of imprisonment.

"Indeed, until conviction at trial and the imposition of a sentence, the length of the pretrial detainee's confinement is uncertain. So too until a parole revocation hearing has been held, and the parole violator's parole is revoked and he is recommitted, his status with respect to confinement is similarly uncertain. In short, just as pretrial incarceration is a transitory and impermanent state, incarceration pursuant to a parole violation warrant is just as transitory and impermanent. Both place the prisoner in no more than a 'holding pattern.'" (Footnote omitted, emphasis in original.)

[7] The choice is among August 9, 1983, when the detainer was lodged; December 2, 1983, when the defendant's counsel requested in writing that the Suffolk district attorney arraign and try his client on the Suffolk indictments; January 17, 1984, when the defendant made what we will assume to be a proper request for the disposition of all charges against him; or March 13, 1984, when the defendant had his parole revoked and resumed serving his Federal sentence.

that the four requirements which trigger the relevant time periods in the Agreement[8] do not have to occur in any special sequence. He reasons that, upon the occurrence of the last of the requirements, the limitation periods should be deemed to have commenced running on the date of the first requirement, here August 9, 1983, when the Suffolk detainer was filed. The calculation, of course, supports his position. If carried to its logical extreme, however, such an approach would likely cause considerable confusion. For example, immediately upon pretrial detention, prisoners could file requests under the Agreement for final disposition of all charges pending in other jurisdictions, even though they had not yet been convicted of the offenses for which they were held, had their places of confinement finally determined, or had detainers lodged against them. Prosecuting officers would, in turn, be pressed to file detainers prematurely in order to avoid the loss of their rights to prosecute. Not surprisingly, there is little authority to support the argument favoring this methodology.[9]

We think that the applicable date for measuring the relevant time periods in this case is no earlier than March 13, 1984, when the defendant actually entered upon a term of imprisonment. On that date all four requirements under the Agreement had been satisfied.[10] We can assume that the defendant was not required to file after March 13, 1984, a new request for

---

[8] These requirements are: the prisoner's entering upon a term of imprisonment; the existence of pending extra-jurisdictional charges; the lodging of a detainer based upon those charges; and the prisoner's request for final disposition of them.

[9] The defendant relies heavily on the decision in *United States* v. *Hutchins,* 489 F. Supp. 710, 713 (N.D. Ind. 1980). There is language in that decision (at 713) that the four requirements described in note 8, *supra,* do not have to "accrue in any special sequence." That decision, however, does not support the defendant's position that the relevant time relates back to the date the detainer is filed. The other decision relied on by the defendant, *Nash* v. *Jeffes,* 739 F.2d 878 (3d Cir. 1984), was reversed by the United States Supreme Court in *Carchman* v. *Nash,* 473 U.S. 716 (1985).

[10] Establishing this date as the critical one follows the approach used in *United States* v. *Hutchins, supra,* the case upon which the defendant primarily relies. See note 9, *supra.*

the final disposition because both the Berkshire and Suffolk prosecutors should have been aware of the applicability of the Agreement, and both were fully prepared to try Petrozziello.[11]

Lastly, we must determine what periods of time have expired under the relevant limitations periods. Both art. III(*a*) and art. IV(*c*) provide for the tolling of those periods during "any necessary or reasonable continuance." See *United States* v. *Scheer,* 729 F.2d at 168-169; *United States* v. *Roy,* 771 F.2d 54, 59 (2d Cir. 1985); *Commonwealth* v. *Fasano,* 6 Mass. App. Ct. 325, 333 (1978). Here, the Agreement's speedy trial clock ran for six days (March 13 through March 18, 1984) before it was tolled for the Berkshire trial (March 19 through April 6, 1984). It then ran from April 7, 1984, until May 10, 1984 (a total of thirty-four days), when this motion to dismiss was filed. It has been suspended ever since by the time required to decide the motion. See *Commonwealth* v. *Fasano,* 6 Mass. App. Ct. at 333-334 (1978). The clock will not start running again until the rescript on this appeal has been entered in the trial court. Thus, forty days have elapsed, and no relevant time period in the Agreement has been violated.[12]

2. The defendant's second argument is that the language in arts. III(*d*), IV(*e*), and V(*c*) of the Agreement requires dismissal of the Suffolk County indictments because he was returned to Federal custody after his acquittal on the Berkshire charge.

We do not think that the drastic sanction of dismissal of first degree murder and armed robbery charges should apply where the defendant's return to Federal custody was the result of a mistake. The Berkshire district attorney's letter to all other district attorneys warning them of the requirements of the Agreement is evidence of an intention to comply with its terms. On April 6, 1984, when the Berkshire trial ended, the Suffolk

---

[11] We do not suggest that in other cases it would be inappropriate to require that the four events occur in the order suggested by note 8, *supra.* Situations arising under the Agreement are fact specific and, like most speedy trial problems, are to be dealt with discretely, not mechanically.

[12] We assume that the Suffolk district attorney will bring this decision to the attention of his counterparts in the Northern and Plymouth districts, who also have indictments pending against the defendant.

prosecutor was fully prepared to try the defendant immediately on the pending indictments. The Suffolk prosecutor was unaware of the defendant's return to Federal custody and assumed, as Mr. Ford testified, that the defendant would be transferred directly from Berkshire to Suffolk, where he would stand trial. Thus, this is not a case where detainers were being used "by prosecutors to exact punishment without having to try a charge which they feel would not result in a conviction." Note, Detainers and the Correctional Process, 1966 Wash. U.L.Q. 417, 423. In this important respect, the purposes of the Agreement cannot be said to have been violated.

Moreover, we do not consider dismissal appropriate in the absence of proof that the defendant's rehabilitation has been adversely affected. "Many . . . courts . . . have concluded that indictments should not be dismissed under [the Agreement] if the prisoner has not shown that his return to the sending state before trial in the receiving state impeded or affected his rehabilitation." *Malone* v. *United States,* 482 A.2d 768, 771 (D.C. 1984), and numerous cases cited. While in some cases proof that the prisoner's rehabilitation has been affected may not be necessary before an order of dismissal is entered, we think, in view of the seriousness of the charges, that such proof was required here.[13]

We recognize that some courts have approved dismissals based on the flat language of the Agreement, regardless of whether the sanction furthered its purposes. See the cases cited in *Malone* v. *United States,* 482 A.2d at 772. The decisions, at least those principally relied upon by the defendant, are distinguishable or of questionable vitality.[14] More recent deci-

---

[13] The defendant makes only a conclusory statement in his reply brief that his efforts at rehabilitation "may be frustrated." This statement is insufficient to establish that his return to Suffolk would contravene a main purpose of the Agreement.

[14] See, e.g., *State* v. *Wiggins,* 425 So.2d 621 (Fla. Dist. Ct. App. 1983); *State* v. *Keener,* 224 Kan. 100 (1978); *United States* v. *Eaddy,* 595 F.2d 341 (6th Cir. 1979). In *Wiggins,* after a Federal prisoner filed a request for final disposition of detainers that had been lodged from two Florida counties, one county asked for, and was granted, temporary custody of the prisoner

sions view cases like the present one with circumspection, and decline to dismiss serious charges where that sanction would not further the Agreement's purposes. See *Malone* v. *United States, supra.* See also *United States* v. *Roy,* 771 F.2d 54 (2d Cir. 1985). In this respect, the decisions follow what now appears to be the attitude of the United States Supreme Court concerning the Agreement's construction. See *Carchman* v. *Nash,* 473 U.S. at 731-734.

Having dealt with all the issues raised by the reported questions, and having found the judge's denial of the motion correct, we see no need to frame a rescript beyond:

> *Order denying motion to*
> *dismiss affirmed.*

---

pursuant to the Agreement. That charge disposed of, the prisoner was returned to Federal custody and released on parole before the second county sought extradition to pursue its charges. Thus, the very vice the Agreement seeks to remedy (dormant detainers awaiting the conclusion of prior sentences) was committed by the State authorites. Furthermore, the opinion, barely two pages long, provides no other information about the circumstances that gave rise to it. In *Keener,* the facts track ours more closely. However, one of the cases cited therein for its central proposition (*United States* v. *Mauro,* 544 F.2d 588 [2d Cir. 1976]) was reversed (*United States* v. *Mauro* 436 U.S. 340 [1978] ), casting doubt on the continued vitality of the *Keener* decision. In *Eaddy,* the authorities violated the time requirements of arts. III and IV by not bringing a prisoner to trial for 291 days, and twice transferred him back to Federal custody after a detainer had been lodged against him. Moreover, the Government did not even contest that the time requirements of the Agreement had been violated.